UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | No. 22-CR-99 (RJL) |
| : | |
| JAKE MAXWELL, : | |
| : | |
| Defendant. : | |

## UNITED STATES' TRIAL BRIEF

The United States of America respectfully submits this trial brief in advance of the November 7, 2023 bench trial scheduled before this Court in this case. The brief provides a summary of the defendant's conduct that will support the charged offenses, a summary of the charges and elements, a summary of the anticipated government witnesses' testimony, and a discussion of certain evidentiary issues anticipated to arise, specifically related to the authenticity of government exhibits.

**I.    Request for Opening Statement**

The government respectfully requests a brief opening statement.

**II.    The January 6 Capitol Riot and The Defendant's Action**

The Defendant's role in the January 6, 2021, attack on the U.S. Capitol is described in the statement of facts supporting the criminal complaint. *See* ECF No. 1. On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol at approximately 1:00 p.m. to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. Temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were attempting to keep the crowd that had gathered outside away from the Capitol building and the proceedings underway inside.

1

Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts. Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed. At all relevant times, the United States Capitol building and its grounds—including the Lower West Terrace on the West Front, and the entire Capitol building itself—were closed to members of the public.

Jake Maxwell ("Maxwell")—along with his father, Shane Maxwell ("Shane"), and his friend, Bryce Hogarth ("Hogarth")—traveled from Georgia to Washington, D.C. on January 5, 2021. On the morning of January 6, he attended the former president's "Stop The Steal" rally, where the former president and others spoke about alleged fraud in the recent presidential election and the events that were set to take place at the Capitol that day; namely, the certification of the electoral college vote. After the rally, the defendant, Shane, and Hogarth marched towards the United States Capitol where they entered onto restricted Capitol grounds. On January 6, 2021, the Capitol grounds were closed due to the construction of the inaugural stage. The area was also restricted due to the certification taking place in the Capitol. Finally, the building was closed due to the Covid-19 pandemic. The United States Capitol Police (USCP) had erected barricades lining the perimeter of the restricted grounds, including bicycle-rack style fencing with signs that read, "AREA CLOSED – By order of the United States Capitol Police Board," tall snow fencing, and officers stationed throughout the grounds. *See* Government Exhibits 101,

103, 105, 107-109. As the crowd approached the Capitol building, they barreled through the barriers and flooded the Capitol grounds on the West front as depicted in Government Exhibit Series 300 and 500 and Government Ex. 101.



*Government Exhibit 101 – CCTV footage showing the rioters flooding onto the West front of Capitol Grounds*

On the West Plaza, police officers had established a line extending the length of the Capitol building on the West front. The officers were faced with a fast-growing number of rioters in the restricted area. The two sides fought over the establishment and reinforcement of a police defensive line on the plaza with batons, makeshift projectiles, pepper spray, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site. The USCP requested additional assistance from the Metropolitan Police Department (MPD). Once they arrived, MPD officers reinforced the police line and established an additional layer of bike racks to keep the growing crowd back. In additional to physically attempting to hold the line and prevent rioters from getting closer to end entering the Capitol building, officers continued to yell commands at the crowd, instructing them to "move back" and leave the grounds. These commands were met with rioters throwing objects at the police and using the force of the crowd to eventually break that police line, as rioters yelled "push" and cursed at officers. The rioters eventually prevailed as they far outnumbered officers.

Maxwell was among the group of rioters who illegally entered the U.S. Capitol grounds that day.

Specifically, on January 6, 2021, just before 2:30 p.m., which was around the same time the House and Senate Chambers were evacuated, Maxwell was part of the group that broke through the police line on the West Plaza. During and as part of that breach, he assaulted two officers. Maxwell first banged on and pushed the riot shield of an unidentified States USCP officer. Then Maxwell moved forward to MPD Ofc. Laschon Harvell where Maxwell first sent Ofc. Harvell reeling as depicted on overhead CCTV video footage.



*Government Exhibit 301.1 at approx. 23 seconds*

Then Maxwell hooked his arm around Ofc. Harvell's baton and continued to grab and pull on it after Ofc. Harvell fended off Maxwell's first attack.



*Government Exhibits 401.2 and 401.3*

Despite the repeated warnings, the deployment of the dispersal orders, riot control agents, and impact weapons, few members of the crowd left. To the contrary, the mob in the restricted area

4

continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After engaging in these attacks, Maxwell and Shane initially sought refuge under the scaffolding erected for the upcoming inauguration. Thereafter, Maxwell, Shane, and Hogarth made their way up close to the building, first finding themselves among the first rioters breach on the Inaugural Stage by 2:40 pm. CCTV and open-source footage depicts Maxwell and his companions cheering to the crowd from the balcony of the Inaugural Stage upon their arrival. Maxwell then ran toward "the Tunnel"—an area of the Inaugural Stage where rioters would spend much of the day battling law enforcement to gain entry to the very center of the Capitol.



*Government Exhibit 101 – CCTV footage showing the rioters flooding onto the West front of Capitol Grounds, including the Inaugural Stage, with Maxwell circled.*

After approaching the Tunnel's exterior, Maxwell once again moved closer to the Capitol building, reaching the Upper West Terrace by at least 3:07 pm. After positioning himself at a railing along the Upper West Terrace, Maxwell proceeded to cheer, raise flags, laugh, and

talk with other rioters for well over an hour. From his vantage point, he was free to look down at the violence occurring at the Tunnel below with minimal risk to himself, and body-worn camera footage from MPD Officer Valentin-Aponte confirms he did just that.



*Government Exhibit 409 – Body-worn camera footage showing the Maxwell and other rioters on the Upper West Terrace of the Capitol, with Maxwell circled*

Despite his position of relative safety on the Upper West Terrace, Maxwell did not attempt to leave the Capitol and avoid the violence. Instead, to end his day, by 4:59 pm he had returned to one of the most violent sites on Capitol grounds: the Tunnel. Although he did not ever enter the Tunnel, Maxwell positioned himself outside the Tunnel as rioters made increasingly wild efforts to break through the line of officers protecting the area. As rioters screamed, flashed strobe lights at officers, and threw large objects into the mouth of the tunnel, Maxwell calmly watched. In all, Maxwell is estimated to have been on the Capitol grounds for approximately three hours that day.



*Government Exhibit 518 – Getty Images footage showing Maxwell (circled) outside "the Tunnel" around 5:00 pm*

### III. Charges Against Defendant Jake Maxwell

Maxwell is charged as follows:

Count One: 18 U.S.C. § 231(a)(3), Civil Disorder

Count Two: 18 U.S.C. § 111(a)(1), Assaulting, Resisting, or Impeding Certain Officers

Count Three: 18 U.S.C. § 111(a)(1), Assaulting, Resisting, or Impeding Certain Officers

Count Four: 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds

Count Five: 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building or Grounds

Count Six: 18 U.S.C. § 1752(a)(4), Engaging in Physical Violence in a Restricted Building or Grounds

Count Seven: 40 U.S.C. § 5104(e)(2)(F), Act of Physical Violence in the Capitol Grounds or Buildings

### IV. Elements of the Crimes Alleged

1. 18 U.S.C. § 231(a)(3)

Count One of the Indictment charges the defendant with civil disorder, in violation of 18 U.S.C. § 231(a)(3). To find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1. First, the defendant knowingly committed or attempted to commit an act with the intended purpose of obstructing, impeding, or interfering with one or more law enforcement officers.

2. Second, at the time of the defendant's actual or attempted act, the law enforcement officer or officers were engaged in the lawful performance of their official duties incident to and during a civil disorder.

3. Third, the civil disorder in any way or degree obstructed, delayed, or adversely affected either commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.

The term "civil disorder" means any public disturbance involving acts of violence by groups of three or more persons, which (a) causes an immediate danger of injury to another individual, (b) causes an immediate danger of damage to another individual's property, (c) results in injury to another individual, or (d) results in damage to another individual's property.

The term "commerce" means commerce or travel between one state, including the District of Columbia, and any other state, including the District of Columbia.  It also means commerce wholly within the District of Columbia.[1]

The term "federally protected function" means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof, which may include the United States Secret Service or United States Capitol Police.[2]

---

[1] Modified definition of 18 U.S.C. § 232(2) from jury instructions in *United States v. Pugh*, 20-cr- 73 (S.D. Ala. May 19, 2021); *see also United States v. Schwartz, et al.*, No. 21-cr-178 (APM) (ECF No. 172 at 18); *United States v. Thomas*, No. 21-cr-552 (DLF) (ECF No. 150 at 21).

[2] *See* 18 U.S.C. § 232(3).

A person acts "knowingly" if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident. In deciding whether the defendant acted knowingly, you may consider all of the evidence, including what the defendant did, said, or perceived.[3]

### 2. 18 U.S.C. § 111(a)(1)

Counts Two and Three of the Indictment charge the defendant with assaulting, resisting, and impeding certain law enforcement officers, in violation of 18 U.S.C. § 111(a)(1). To find the defendants guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1. The defendant assaulted, resisted, opposed, impeded, intimidated, or interfered with officers of the Metropolitan Police Department or the U.S. Capitol Police.

2. The defendant did such acts forcibly.

3. The defendant did such acts voluntarily and intentionally.

4. The defendant assaulted, resisted, opposed, impeded, intimidated, or interfered with was an officer or an employee of the United States who was then engaged in the performance of his official duties assisting officers of the United States who were then engaged in the performance of their official duties.

5. The defendants made physical contact with a person who was an officer or an employee of the United States who was then engaged in the performance of his official duties or assisting officers of the United States who were then engaged in the performance of their official duties, or acted with the intent to commit another felony. For purposes of this element, "another felony" refers to the other felony offense charged in the Indictment, specifically 18 U.S.C. § 231(a)(3).

---

[3] *See* The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit §§ 1512 & 1515(a)(1); *see also Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005); *United States v. Carpenter*, No. 21-cr-305 (JEB) (ECF No. 97 at 11) (including instruction that the evidence to be considered includes "what [the defendant] did, said, or perceived"); *United States v. Kelly*, No. 21-cr-708 (RCL) (ECF No. 101 at 9) (same).

The defendants acted "forcibly" if he used force, attempted to use force, or threatened to use force against the officer. Physical force or contact is sufficient but actual physical contact is not required. You may also find that a person who has the present ability to inflict bodily harm upon another and who threatens or attempts to inflict bodily harm upon that person acts forcibly. In such case, the threat must be a present one.[4]

The term "assault" means any intentional attempt or threat to inflict injury upon someone else, when coupled with an apparent present ability to do so. To find that the defendant committed an "assault," you must find beyond a reasonable doubt that the defendant intended to inflict or to threaten injury. Injury means any physical injury, however small, including a touching offensive to a person of reasonable sensibility.[5]

The terms "resist," "oppose," "impede," "intimidate," and "interfere with" carry their everyday, ordinary meanings.

---

[4] *United States v. Taylor*, 848 F.3d 476, 493 (1st Cir. 2017) (The element of "forcible" action can be met by a showing of either physical contact with the federal agent, or by such a threat or display of physical aggression toward the officer as to inspire fear of pain, bodily harm, or death.) (quotation marks omitted) (citing cases).

[5] *United States v. Watts*, 798 F.3d 650, 654 (7th Cir. 2015) ("An assault may also be committed by a person who intends to threaten or attempt to make offensive rather than injurious physical contact with the victim."); *United States v. Acosta-Sierra*, 690 F.3d 1111, 1117 (9th Cir. 2012) ("Because Section 111 does not define assault, we have adopted the common law definition of assault as either (1) a willful attempt to inflict injury upon the person of another, or (2) a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.") (quotation marks omitted); *Comber v. United States*, 584 A.2d 26, 50 (D.C. 1990) (en banc) (explaining that the crime of simple assault "is designed to protect not only against physical injury, but against all forms of offensive touching, . . . and even the mere threat of such touching"); Criminal Jury Instructions for the District of Columbia, No. 4.100 (2022 ed.) ("Injury means any physical injury, however small, including a touching offensive to a person of reasonable sensibility."). For other January 6 trials that have used similar instructions, see *United States v. Jensen*, No. 21-cr-6 (TJK) (ECF No. 97 at 30), and *United States v. Webster*, No. 21-cr-208 (APM) (ECF No. 101 at 14).

It is not necessary to show that the defendant knew the person being forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with was, at that time, carrying out an official duty so long as it is established beyond a reasonable doubt that the person was, in fact, carrying out an official duty and that the defendant intentionally forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with that officer.[6]

3.      18 U.S.C. § 1752(a)(1)

Count Four of the Indictment charges the defendant with entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2). To find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1. First, the defendant entered or remained in a restricted building or grounds without lawful authority to do so.

2. Second, the defendant did so knowingly.

The term "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting.

The term "person protected by the Secret Service" includes the Vice President and the immediate family of the Vice President.

The term "knowingly" has the same meaning described in the instructions for Count One.

4.      18 U.S.C. § 1752(a)(2)

Count Five of the Indictment charges the defendant with disorderly or disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2). To find the defendant

---

[6] *United States v. Thomas*, No. 21-cr-552 (DLF) (ECF No. 150 at 30).

guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1. First, that the defendant engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building or grounds.

2. Second, that the defendant did so knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions.

3. Third, that the defendants' conduct occurred when, or so that, their conduct in fact impeded or disrupted the orderly conduct of Government business or official functions.

"Disorderly conduct" is conduct that tends to disturb the public peace or undermine public safety.[7] Disorderly conduct includes when a person acts in such a manner as to cause another person to be in reasonable fear that a person or property in a person's immediate possession is likely to be harmed or taken or is unreasonably loud and disruptive under the circumstances.[8]

"Disruptive conduct" is a disturbance that interrupts an event, activity, or the normal course of a process.[9]

The term "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will

---

[7] *United States v. Grider*, 21-cr-22 (CKK) (ECF No. 150 at 24) ("'[D]isorderly' conduct is that which 'tends to disturb the public peace, offend public morals, or undermine public safety.' 'Disorderly,' *Black's Law Dictionary* (9th ed. 2009); *see also* 'Disorderly,' *Oxford English Dictionary* (2nd ed. 1989) ('Not according to order or rule; in a lawless or unruly way; tumultuously, riotously.')").

[8] *United States v. Schwartz, et al.*, 21-cr-178 (APM) (ECF No. 172 at 27); *United States v. Gietzen*, 22-cr-116 (CJN) (ECF No. 50 at 32); *United States v. Alam*, 21-cr-190 (DLF) (ECF No. 104 at 237-38).

[9] Redbook 6.643.

be temporarily visiting.

The term "person protected by the Secret Service" includes the Vice President and the immediate family of the Vice President.

The term "knowingly" has the same meaning described in the instructions for Count One.

5.     **40 U.S.C. § 1752(a)(4)**

Count Six of the Indictment charges the defendant with Engaging in Physical Violence in a Restricted Building or Grounds, in violation of Title 18, United States Code, Section 1752(a)(4). In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1. First, the defendant engaged in an act of physical violence against a person or property in, or in proximity to, a restricted building or grounds.
2. Second, the defendant did so knowingly.

The term "act of physical violence" means any act involving an assault or other infliction of bodily harm on an individual; or damage to, or destruction of, real or personal property.

The term "restricted building or grounds" has the same meaning described in the instructions for Count Four.  The term "knowingly" has the same meaning described in the instructions for Count One.

6.     **40 U.S.C. § 5104(e)(2)(F)**

Count Seven of the Indictment charges the defendant with an Act of Physical Violence in the Capitol Grounds or Buildings, which is a violation of federal law. In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

13

1. First, the defendant engaged in an act of physical violence within the Capitol Buildings or Grounds.

2. Second, the defendant acted willfully and knowingly.

The term "act of physical violence" means any act involving an assault or other infliction or threat of infliction of death or bodily harm on an individual; or involving damage to, or destruction of, real or personal property. For purposes of this offense, unlike the offense in Count Six, the threat of infliction of bodily harm is sufficient to meet this definition.

A person acts "willfully" if he acts with the intent to do something that the law forbids, that is, to disobey or disregard the law. While the government must show that a defendant knew that the conduct was unlawful, the government does not need to prove that the defendant was aware of the specific law that his conduct violated.[10]

The term "Capitol Buildings" includes the United States Capitol located at First Street, Southeast, in Washington, D.C. The "Capitol Grounds" are defined by the United States Code, which refers to a 1946 map on file in the Office of the Surveyor of the District of Columbia. The boundaries of the Capitol Grounds include all additions added by law after that map was recorded. The Capitol Grounds includes the portion of Pennsylvania Avenue Northwest from the west curb of First Street Northwest to the curb of Third Street Northwest.

The term "knowingly" has the same meaning described in the instructions for Count One.

---

[10] As the Supreme Court has explained, "willfully" is "a word of many meanings whose construction is often dependent on the context in which it appears." *Bryan v. United States*, 524 U.S. 184, 191 (1998) (internal quotation marks omitted). "As a general matter, when used in the criminal context, a 'willful' act is one undertaken with a bad purpose. In other words, in order to establish a 'willful' violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful." *Id.* at 191-92 (internal quotation marks omitted).

V.   **Stipulations**

The parties have provided the Court with the following signed stipulations: the following facts: (1) a description of the Capitol Building and Grounds; (2) the certification of the electoral college vote; and (3) because of the events at the U.S. Capitol on January 6, 2021, Safeway closed all 12 of its stores in the District of Columbia as of 4:00 p.m., and the scheduled shipments for the remainder of the day could not be delivered because the stores were closed and employees were not working.

VI.   **Trial Testimony**

The government intends to call the following witnesses in its case-in-chief. The government reserves the right to call any additional witness listed on the government's witness list during its case-in-chief or in its rebuttal case.

**United States Capitol Police Deputy Chief Thomas Loyd** will provide overview testimony regarding the riot that took place at the Capitol on January 6, 2021. Inspector Loyd will identify relevant locations at the Capitol, and he will describe how the area was restricted by a perimeter of bicycle racks and snow fencing and was closed to the public because of the certification, COVID-19, and the construction of the inaugural stage. Inspector Loyd will explain that other law enforcement agencies assisted the USCP in protecting the Capitol on January 6, 2021. He will briefly address how rioters broke through those barriers, advanced to the Lower West Terrace, and many eventually entered the Capitol building. Deputy Chief Loyd will testify about the numerous other breaches that followed as the Capitol was besieged from all sides, engulfed in a civil disorder. He is expected to testify that the presence and actions of the mob impacted the USCP's ability to perform their job duties. Deputy Chief Loyd is expected to testify that Vice President Mike Pence was visiting the Capitol on January 6, 2021, and was

protected by the United States Secret Service. Deputy Chief Loyd can authenticate CCTV video footage, photos, videos, and maps and models of the Capitol grounds included in Government Exhibit Series 100, 300, and 500. Finally, Deputy Chief Loyd will explain that for safety reasons, Congress could not reconvene until every single rioter and unauthorized person was removed from the Capitol Building and the grounds, and that each rioter there that day contributed to the chaos and made it extremely difficult for him and other officers to do their job.

**Metropolitan Police Department Officer Laschon Harvell** will testify about being a member of the MPD's Civil Disturbance Unit (CDU) on January 6, 2021. He will detail how he and his unit were called to the Capitol to provide reinforcements for the USCP who were overwhelmed by the rioters. He will explain how he arrived and immediately went to the West Front of the Capitol. Ofc. Harvell will also provide testimony regarding the riot and civil disorder on the West Front of the Capitol building and grounds, where the defendant initially approached the Capitol. He will further detail his participation in the conflicts between law enforcement and rioters on the West Plaza, including the altercations the defendant had with police, including himself, there. Finally, he will explain what happened at the tunnel that day at the time the defendant was stationed just above and then in front of the tunnel as rioters were fighting with officers while attempting to make entry to the building. Ofc. Harvell can authenticate numerous video exhibits in the 300, 400, and 500 series, including footage from his and other MPD officers' body worn camera (BWC) from January 6, and also walk the Court through some of the video and photographic exhibits concerning the defendant's actions at the Capitol during and around the time of the riot.

**Federal Bureau of Investigation Special Agent Joshua Floyd** will provide testimony regarding the investigation of the defendant and can identify the defendant in the courtroom as

the person charged in the indictment. Agent Floyd will also walk the Court through some of the video and photographic exhibits concerning the defendant's actions at the Capitol during and around the time of the riot. Agent Floyd will also testify regarding the arrest and search warrants executed in this case. Agent Floyd can authenticate numerous video exhibits in the 500 series and can identify the defendant in videos in Government Exhibit Series 300, 400, and 500. Finally, Agent Floyd may testify about the defendant's location at various times throughout the day on January 6, 2021, his actions throughout that day, and discussions/interviews that the defendant partook in after his participation in the Capitol riot.

## VII. Evidentiary Issues

### A. Authentication Of Video Evidence

The government will present much of its evidence through video that captured the defendant on the Capitol grounds on January 6, 2021. In addition to Capitol Police surveillance footage, body worn camera footage, the government will seek to introduce video footage taken by photojournalists and others who were present at the Capitol that day. Based upon our pretrial conferences, it appears that the photos and videos defendant object to in the 500 series are as follows:

To authenticate the videos taken by photojournalist and other defendants, the government will employ a combination of the following methods, *each* of which is independently sufficient for purposes of Federal Rule of Evidence 901:

a. Testimony from MPD and USCP officers establishing that the events depicted in the video match their recollection of events they perceived on January 6, 2023, and the officers can identify themselves in the video;

b. A comparison between the video footage and contemporaneous CCTV footage captured at the United States Capitol showing overlapping events and people; and

  c. A comparison between the video footage and contemporaneous body worn camera footage captured at the United States Capitol showing overlapping events and people.

The methods described above are more than adequate to satisfy Rule 901. The interplay of both Federal Rules of Evidence 104 and 901 liberally allows authentication of exhibits through various means. For authentication purposes, the proponent of the evidence— here, the government—need only satisfy the court that there is sufficient evidence "to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). "[A]uthentication may be achieved through 'the appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.'" *United States v. Kilpatrick*, No. 10-20403, 2012 WL 3236727, at *4 (E.D. Mich. Aug. 7, 2012), *aff'd* 798 F.3d 365, 383 (6th Cir. 2015) (quoting Fed. R. Evid. 901(b)(4)).

As has been noted by many courts, establishing an item's authenticity is not "a particularly high hurdle." *United States v. Ortiz*, 966 F.2d 707, 716 (1st Cir. 1992); s*ee also United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009) ("The burden to authenticate under Rule 901 is not high"); *Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 927 (3d Cir. 1986) ("The burden of proof for authentication is slight."); *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 48 (D.D.C. 2016) ("The threshold for the Court's determination of authenticity is not high, . . . and the proponent's burden of proof for authentication is slight[.]") (citation and quotation marks omitted).

To make a prima facie showing of authenticity, "circumstantial evidence of authenticity can be sufficient." *United States v. Bruner*, 657 F.2d 1278, 1284 (D.C. Cir. 1981); *see, e.g.*, *United States v. Broomfield*, 591 F. App'x 847, 851 (11th Cir. 2014) (unpublished) ("Authentication may be established 'solely through the use of circumstantial evidence.'"). And importantly, the

party seeking to admit evidence need not "rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *United States v. Holmquist*, 36 F.3d 154, 168 (1st Cir. 1994).  Rather, "the government must only 'demonstrate that, as a matter of reasonable probability, possibilities of misidentification and adulteration have been eliminated.'" *United States v. Celis*, 608 F.3d 818, 842 (D.C. Cir. 2010) ((quoting *United States v. Stewart*, 104 F.3d 1377, 1383 (D.C. Cir. 1997)).

Certainly, with a good faith basis, the defendants are free to argue that evidence has been altered; however, questions concerning possible alterations go to the weight the fact finder should give the evidence, not to its authenticity.  *United States v. Safavian*, 435 F. Supp. 2d 36, 41 (D.D.C. 2006) (finding that arguments that earlier emails included in an email chain may have been altered before being forwarded are "more appropriately directed to the weight the jury should give the evidence, not to its authenticity").

### VIII. Updated Government Exhibit List

The Government's updated exhibit list is included in this filing as Attachment 1.

>  Respectfully submitted,
>
>  MATTHEW M. GRAVES
>  United States Attorney

November 6, 2023    By:    */s/ Elizabeth N. Eriksen*
ELIZABETH N. ERIKSEN
VA Bar no. 72399
Trial Attorney, Detailee
U.S. Dept. of Justice, Criminal Division
Detailed to the USAO-DC
601 D Street NW
Washington, DC 20530
elizabeth.eriksen2@usdoj.gov
(202) 616-4385

/s/ Nathaniel K. Whitesel
NATHANIEL K. WHITESEL
Assistant United States Attorney
DC Bar No. 1601102
601 D Street NW
Washington, DC 20530
nathaniel.whitesel@usdoj.gov
(202) 252-7759

/s/ Sean J. Brennan
SEAN J. BRENNAN
Assistant United States Attorney
NY Bar No. 5954128
601 D Street NW
Washington, DC 20530
sean.brennan@usdoj.gov
(202) 252-7125