## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-CR-99 (RJL)** |
| **JAKE MAXWELL** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jake Maxwell to 57 months of incarceration (the midpoint of the applicable guidelines range as calculated by the government), 36 months of supervised release, $2,000 in restitution, and a mandatory special assessment of $100 for Count One and $25 each for Counts Four and Five.

### I.      INTRODUCTION

The defendant, Jake Maxwell, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that interrupted the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Maxwell worked his way to the front of the crowd gathered on the West Plaza and joined the mob in breaching the police line protecting the Capitol at 2:27 p.m. There, Maxwell pushed up against the riot shield of an unidentified U.S. Capitol Police ("USCP") officer and hooked his arm around Metropolitan Police Department ("MPD") Officer L.H.'s police baton. Maxwell then grabbed at the baton with his hands, forcing Officer L.H. to deploy a "rip" maneuver to regain control of the baton. After being pulled away from the fighting by his father, Maxwell waited under the southwest scaffolding until the police were forced to retreat, then joined the mob in ascending first to the Inaugural Stage, and later to the Upper West Terrace, where he remained for over an hour. While on the Inaugural Stage and Upper West Terrace, Maxwell watched some of the worst violence that occurred at the Capitol that day, in the nearby "Tunnel," for about three hours.

Maxwell was convicted at trial of violating 18 U.S.C. §§ 231(a)(3), 1752(a)(1), and 1752(a)(2). The government's sentencing recommendation is supported by (1) Maxwell's presence at the forefront of the violent mob on the West Plaza, (2) his physical encounters with multiple law enforcement officers, (3) the lengthy period of time Maxwell remained on Capitol grounds observing violence, and (4) his materially false testimony at trial on this conduct. Moreover, the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Maxwell's crime support a sentence of 57 months of incarceration.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021, Attack on the Capitol

The government refers the court to the Statement of Facts supporting the criminal complaint filed in this case, ECF 1, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B.     Jake Maxwell's Role in the January 6, 2021, Attack on the Capitol

Maxwell lives in Athens, Georgia. On January 5, 2021, he traveled to Washington, D.C. with his father, and a friend, to—as he testified—"observe" the events and to protest.

On January 6, 2021, Maxwell and his two companions attended the "Stop the Steal" rally in support of then-President Donald Trump. At the rally, the former president and others spoke about alleged fraud in the recent presidential election and the events that were set to take place at the Capitol that day; namely, the certification of the electoral college vote. Maxwell testified that he was aware that Congress had assembled in the Capitol that day to certify the 2020 Presidential Election results.

After attending the rally, Maxwell and his two companions walked to the U.S. Capitol. Upon arriving at restricted Capitol grounds and joining the violent mob that had begun to assemble on the west front, the three made their way to the front of the crowd on the Capitol's west plaza. Around this time, officers on the west plaza were attempting to hold a police line to prevent rioters from getting closer to and entering the Capitol building, while directing the crowd to "move back" and leave the grounds.

Maxwell's father testified that during the previous protests he and Maxwell had attended, they "always" liked to get "as close as possible," and, at some time between 2:00 p.m. and 2:27

3

p.m., Maxwell and his two companions made their way into the heart of the mob—eventually reaching the very front. Along the way, Maxwell witnessed rioters engaging in violence against police officers.



*Image 1: Screenshot of Government's Trial Exhibit 502, with Maxwell circled in red and facing a gap in the crowd where rioters battled police officers*

### Breach of the Police Line on the West Plaza

By 2:27 p.m., Maxwell had reached the front of the crowd and positioned himself directly across from a police line which utilized bike rack barriers. At this point, the mob pushed through the barriers and breached the police line.

4



*Image 2: Screenshot of Government's Trial Exhibit 301, with the area where Maxwell would soon breach the police line circled in red*

The Court expressly found that Maxwell actively participated in this breach: "Maxwell surged forward into the police line and, in fact, breached it…." Evidence presented at trial depicted Maxwell pushing up against the riot shield of a USCP officer at approximately 2:27:55 p.m.



*Image 3: Government's Trial Exhibit 401.1, with Maxwell circled in red, showing Maxwell pushing against a USCP officer's riot shield*



*Image 4: Government's Trial Exhibit 403.1, with Maxwell circled in red, showing Maxwell pushing against a USCP officer's riot shield*

Over the next few seconds, Maxwell continued pushing forward against the police line, specifically making physical contact with MPD Officer L.H. As Maxwell and other rioters pushed Officer L.H. back several feet out of position, Maxwell reached out towards Officer L.H.'s police baton with his arms and hand. Maxwell then wrapped his arm around the baton and grabbed at it. To prevent losing control of his equipment, Officer L.H. was forced to "rip" the baton downward and away from Maxwell.



*Image 5: Government's Trial Exhibit 401.2, showing Maxwell's arm wrapped around MPD Officer L.H.'s baton*



*Image 6: Government's Trial Exhibit 402.1, with Maxwell's hand circled in red as he grabs Officer L.H.'s baton*

As rioters continued to struggle to break through the police line, Maxwell's father pulled

Maxwell away from the crowd and sought protection from the police. The two remained behind

the police line, underneath scaffolding erected at the southwest end of the Capitol, for a few minutes, until the police lost control of the area and fell back to the Capitol building.

### Maxwell's Continued Participation in the Riot

Maxwell, his father, and his friend then joined the mob as it made its way closer to the Capitol building, moving up to the Capitol's West Terrace and celebrating the riot's progress along the way. Maxwell waved a flag, cheered, and gestured to the rioters, encouraging them to rush further forward toward the Capitol building and police that had fallen back from the Plaza.



*Image 7: Government's Trial Exhibit 511.1, with Maxwell circled in red, showing Maxwell waving an American flag while standing atop the southwest stairs*

Maxwell and his two companions continued to make their way closer to the Capitol building, finding themselves among the first rioters to breach the Inaugural Stage by 2:40 pm. CCTV and open-source footage depict Maxwell and his companions cheering to the crowd from the balcony of the Inaugural Stage upon their arrival.



*Image 8: Government's Trial Exhibit 519, with Maxwell circled in red and standing at the edge of the Inaugural Stage*

Maxwell then ran toward "the Tunnel"—an area of the Inaugural Stage where rioters would spend much of the day battling law enforcement to gain entry to the very center of the Capitol. After approaching the Tunnel's exterior, Maxwell moved to the Upper West Terrace, reaching it by at least 3:07 pm. After positioning himself at a railing along the Upper West Terrace, Maxwell proceeded to cheer, raise flags, laugh, and talk with other rioters for well over an hour. From his vantage point, he was free to look down at the violence occurring at the Tunnel below with minimal risk to himself, and which body-worn camera footage shown at trial confirmed he did just that. Also at trial, testimony from government witnesses established that during the time Maxwell watched, some of the worst violence from January 6 took place in the Tunnel.

9



*Image 9: Screenshot from Government Exhibit 409.1, with Maxwell circled in red and raising his hat to the crowd while standing on the Upper West Terrace*



*Image 10: Screenshot from Government Exhibit 409.1, with Maxwell circled in red while standing on the Upper West Terrace and looking down toward the Tunnel*

Maxwell never attempted to leave the Capitol and avoid the violence. Instead, by 4:59 pm, he returned to the mouth of the Tunnel. Maxwell positioned himself outside the Tunnel as rioters made increasingly wild efforts to break through the line of officers protecting the area. After

reviewing video footage of Maxwell outside the Tunnel at this time, U.S. Capitol Police Deputy Chief Thomas Loyd estimated that Maxwell was located within ten feet of the Tunnel's entrance. As rioters screamed, flashed strobe lights at officers, and threw large objects into the mouth of the tunnel, Maxwell calmly watched. At trial, Maxwell testified that "[t]he people that were throwing things at officers were not there for the right reasons," but maintained that he was present outside the Tunnel for what he described as the "right reasons."



*Image 11: Government Exhibit 518, with Maxwell circled in red and standing within approximately ten feet of the Tunnel*

As police regained control over the Capitol and the crowd of rioters began to disperse, Maxwell, S.M., and B.H. finally left after spending roughly three hours on Capitol grounds.

### *Maxwell's Materially False Testimony at Trial*

At trial, Maxwell testified falsely multiple times. First, Maxwell repeatedly testified that he thought he was allowed to be on Capitol grounds on January 6, 2021. The Court did not credit this testimony and instead found beyond a reasonable doubt that, at a minimum, Maxwell knew he

was not allowed to be on Capitol grounds by the time he encountered the police line at the west plaza around 2:29 p.m.

Second, Maxwell testified that he "did not join a mob that hurt police." But the Court found that Maxwell was, in fact, "part of a crowd that included violent rioters, whose assaultive conduct Mr. Maxwell could not fail to see." Moreover, the Court noted Maxwell's "deliberate[]" actions to reach the front of the "mob."

Third, Maxwell testified that he was unable to see rioters fighting with police officers until he reached the very front of the crowd on the west plaza and was facing the police line. Government counsel impeached Maxwell with video evidence showing him in the middle of the crowd on the west plaza, with a view of fighting against police officers. Only after being shown this evidence did Maxwell admit that "[i]t looks like" he was able to see violence against law enforcement before reaching the front of the crowd.

### III.    THE CHARGES OF CONVICTION

On March 25, 2022, a federal grand jury returned an indictment charging Maxwell with seven counts, including, Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) ("Count One"); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) ("Count Four"); and Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) ("Count Five"). On, November 14, 2024, Maxwell was convicted of those three offenses following a bench trial.

### IV.    STATUTORY PENALTIES

Maxwell now faces sentencing on Counts One, Four, and Five.

As noted by the Presentence Report issued by the U.S. Probation Office, the defendant

faces up to five years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100 for Count One. For each of Counts Four and Five, Maxwell faces up to twelve months of imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). Though it does not contain a full calculation for each count of conviction, the government agrees with the Probation Office's calculation for individual counts, but not its grouping analysis.[2] The full Guidelines analysis is below:

Count One (18 U.S.C. § 231(a)(3))

| Base Offense Level: | 10 | U.S.S.G. §2A2.4 |
|---|---|---|
| Special Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1)(A) – If the offense involved physical contact, increase by 3 levels.<br><br>The Court found beyond a reasonable doubt that Maxwell made physical contact with both USCP and MPD officers during the riot. Specifically, Maxwell made contact with a USCP officer's shield and with MPD Officer L.H.'s baton. |

---

[2] Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The draft PSR does not follow these steps. It concludes that Counts One, Four, and Five group (Draft PSR at ¶ 43)—a conclusion which the government does not agree with, as shown below—and does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

| Cross-Reference | | U.S.S.G. §2A2.4(c)(1) – if the conduct constituted aggravated assault, apply §2A2.2 |
|---|---|---|
| | | "Aggravated assault" means a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (*i.e.*, not merely to frighten), with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony. *See* U.S.S.G. §2A2.2 cmt. n.1. |
| | | Here, (D) is applicable. Maxwell's forceful shove into Officer L.H. after pushing into the USCP officer's shield, combined with his subsequent fight with Officer L.H. over his police baton, amounted to a "felonious assault." The Guidelines do not define "assault" or "felonious assault," and sentencing courts have looked to the common law to define "assault" for Guidelines purposes. *See United States v. Hampton*, 628 F.3d 654, 660 (4th Cir. 2010). Assault encompasses conduct intended to injure another or presenting a realistic threat of violence to another. *See United States v. Dat Quoc Do*, 994 F.3d 1096, 1099 (9th Cir. 2021) (federal common-law assault includes (1) "a willful attempt to inflict injury upon the person of another," or (2) "a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm."). Maxwell's violent shove into Officer L.H. and subsequent fight over the baton was, at the least, a "threat to inflict injury upon the person of another," "coupled with the apparent present ability to do so," that "caused a reasonable apprehension of immediate bodily harm." |
| | | Maxwell committed that felonious assault against Officer L.H. with the intent to commit another felony, to wit: the civil disorder offense of which he was convicted. |
| Base Offense Level: | 14 | U.S.S.G. §2A2.2 |
| Adjustment | +6 | U.S.S.G. §3A1.2: Official Victim |

14

| | | |
|---|---|---|
| | | (a) If (1) the victim was (A) a government officer or employee; (B) a former government officer or employee; or (C) a member of the immediate family of a person described in subdivision (A) or (B); and (2) the offense of conviction was motivated by such status, increase by 3 levels<br><br>(b) If subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person), increase by **6** levels<br><br>The Court found beyond a reasonable doubt not only that Maxwell made physical contact with officers, but also that this physical contact obstructed or impeded their ability to protect the Capitol and its inhabitants. |
| Adjustment | +2 | U.S.S.G. § 3C1.1: Obstructing or Impeding the Administration of Justice<br><br>If (1) the defendant willfully obstructed or impeded, or attempted to instruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct relate to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.<br><br>Here, Maxwell provided materially false testimony under oath, as detailed above. *See* U.S.S.G. §3C1.1 n.4(B). |
| Total Offense Level | 22 | |

Count Four (18 U.S.C. § 1752(a)(1)

| | | |
|---|---|---|
| Base Offense Level: | 4 | U.S.S.G. §2B2.3(a) |
| Special offense characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Cross-Reference | | U.S.S.G. § 2B2.3(c) – If the offense was committed with the intent to commit a felony offense, apply § 2X1.1 in respect to that felony offense. |

15

| | | |
|---|---|---|
| | | Here, Maxwell's trespass, including remaining on restricted Capitol grounds, was committed with the intent to commit the felony interference with law enforcement during a civil disorder for which he was found guilty (Count One of the indictment). The substantive offense is thus Count 1 (18 U.S.C. § 231(a)(3)), and the base offense level for that offense should be applied. |
| Base Offense Level (adjusted) | 22 | U.S.S.G. § 2X1.1(a) provides that the base offense level is "[t]he base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." |
| Total | 22 | |

Count Five (18 U.S.C. § 1752(a)(2)

| | | |
|---|---|---|
| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
| Specific offense characteristic | +3 | U.S.S.G. § 2A2.4(b)(1)(A) – If the offense involved physical contact, increase by 3 levels.<br><br>Maxwell made repeated physical contact with law enforcement officers during the civil disorder. The Court expressly found beyond a reasonable doubt that Maxwell made physical contact with both USCP and MPD officers during the riot. Specifically, Maxwell made contact with a USCP officer's shield and with MPD Officer L.H.'s baton.<br><br>Thus, Maxwell's conduct "involved" physical contact. |
| Cross Reference | 14 | U.S.S.G. § 2A2.4(c)(1) – If the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault).<br><br>Per the application notes to § 2A2.2, "aggravated assault" includes any felonious assault that involved "an intent to commit another felony." For the same reasons the conduct underlying Maxwell's conviction for Count One constitutes aggravated assault, his disorderly and disruptive conduct underlying Count Five also constitutes aggravated assault. |
| Adjustment | +6 | U.S.S.G. §3A1.2: Official Victim |

| | | |
|---|---|---|
| | | (a) If (1) the victim was (A) a government officer or employee; (B) a former government officer or employee; or (C) a member of the immediate family of a person described in subdivision (A) or (B); and (2) the offense of conviction was motivated by such status, increase by 3 levels<br>(b) If subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person), increase by 6 levels<br><br>The Court found beyond a reasonable doubt not only that Maxwell made physical contact with officers, but also that this physical contact obstructed or impeded their ability to protect the Capitol and its inhabitants. |
| Adjustment | +2 | U.S.S.G. § 3C1.1: Obstructing or Impeding the Administration of Justice<br><br>If (1) the defendant willfully obstructed or impeded, or attempted to instruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct relate to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.<br><br>As described above, Maxwell provided materially false testimony under oath. *See* U.S.S.G. §3C1.1 n.4(B). |
| Total Offense Level | 22 | |

**Grouping Analysis**

Under U.S.S.G. § 3D1.2, "closely related counts" group.

<u>Group One</u>

Counts Two and Three group under U.S.S.G. §3D1.2(b) because they involve the same victim—Congress—and similar acts "connected by a common criminal objective"—to stop the certification of the Electoral College vote. *See* U.S.S.G. § 3D1.2(a) and (b). The offense level for

this group is 22.

<u>Group Two</u>

Count One stands in a separate group under U.S.S.G. §3D1.2(b) because the victim of the offense is the officers—MPD Officer Harvey and the unidentified USCP officer. The offense level for this group is 22.

One unit is assigned to Group One. One additional unit is assigned to Group Two since it is as serious (e.g., has the same offense level) as Group One. U.S.S.G. § 3D1.4(a). Because two levels are added to the group with the highest offense level, the Combined Offense level is 24. U.S.S.G. § 3D1.4

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case because Maxwell used violence in connection with the offense; specifically, when he (1) pushed against the police line as part of the crowd on the West Plaza, (2) pushed against a USCP Officer's riot shield, and (3) struggled with Officer L.H. over a police baton. *See* U.S.S.G. § 4C1.1(a)(3) (a defendant is not eligible for Section 4C1.1 if they "use violence or credible threats of violence in connection with the offense"); *United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 4-5 (defining violence under Section 4C1.1). Moreover, Maxwell joined the crowd and supported its efforts as it forced officers to retreat into and fight inside the Tunnel.

Judges in this district have routinely declined to apply Section 4C1.1's two-level reduction to defendants whose conduct mirrors Maxwell's. When sentencing defendants convicted of

18

violating 18 U.S.C. § 231(a)(3), for example, Judge Walton noted that the defendants were cognizant of police efforts to prevent the crowd from advancing and yet they pushed against the police line. *United States v. Arthur and Jessica Rehyer*, 23-cr-138 (RJW). Judge Walton observed that the very objective of breaching the police line would necessitate violence and therefore refused to credit the defendants' claims that they did not intend to engage in violence. Just like the defendants in *Rehyer*, Maxwell "surged forward into the police line" with the objective of breaching that line. Trial Tr. 11/14/2023 at 395. And, like the defendants in *Rehyer*, this Court should not allow Maxwell now to claim that his actions on January 6, 2021, were nonviolent.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[3]

---

[3] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 56. Accordingly, based on the government's calculation of the defendant's total adjusted offense level at 24, Maxwell's Guidelines imprisonment range is 51-63 months' imprisonment.[4]

## VI.   SENTENCING FACTORS UNDER 18 U.S.C§ 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Maxwell's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Maxwell personally engaged in violence that day by pushing against the police line on the West Plaza, including by pushing a USCP Officer's riot shield and struggling with Officer L.H. over his police baton. But pushing against the police line was not enough.Not only did Maxwell participate in the initial breach of the police line on the west front, he ascended to the inaugural stage and spent hours with the mob surrounding the mouth of the Tunnel while other rioters violently assaulted and pushed officers at that location.

Maxwell moved to where the action was. As Maxwell's father told the Court, they "wanted

---

[4] The government also agrees with the Probation Office's conclusion that Maxwell is not entitled to credit for acceptance of responsibility. Maxwell went to trial and contested factual guilt on all counts for which we was convicted. *See* U.S.S.G. §3E1.1 Application Note 2. For example, he contested that he had the intent to impede officers, Nov. 29, 2023 Tr. at 374, or knowledge of any restrictions at the Capitol, *id.* at 378.

to get as close as possible like we always do." Trial Tr. 11/8/23 at 216. Maxwell acknowledged at trial that the officers were "defending the Capitol," but, despite that knowledge, Maxwell struggled with officers and actively aided the mob in helping to remove the protective police line and barriers that the police assembled to keep the crowd at bay. Trial Tr. 11/9/23 at 292, 311.

Although Maxwell claims he was sprayed and stunned and was just looking for a way out, these assertions were belied by the evidence presented at trial. Specifically, in finding Maxwell guilty of the Civil Disorder charge, the Court found that, "Maxwell, who deliberately cut a path to the front of the mob and the police line, and who joined in a crowd that he knew included assaultive rioters, did so with the "intended purpose" of obstructing, impeding, or interfering with the police's mandate to protect the Capitol and its inhabitants and to clear the grounds of all demonstrators. Trial Tr. 11/14/23 at 393-394. The nature and circumstances of Maxwell's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 57 months' incarceration.

### B.  The History and Characteristics of the Defendant

Maxwell is 22-year-old high school graduate who attended college briefly and runs a successful gambling business in Georgia. Maxwell has no criminal history and touts himself as a person who supports law enforcement and loved his country, as opposed to the "bad people in the crowd" on January 6, 2021. Maxwell, however, *was* one of those bad actors. And while Maxwell showed some remorse at trial and admitted he now knows he should not have been at the Capitol that day, none of his actions after he left the West front showed a person who appeared remorseful, as he smiled and laughed with other rioters, cheered and raised his flag, beckoned others to come up on the inaugural stage, and watched officers get assaulted over and over again. In fact, it seems

that Maxwell's "remorse" stems from the fact that he got caught and is now facing jail time. His false testimony at trial further reveals troubling characteristics; specifically, a willingness to lie or minimize his own conduct for personal gain. These factors support the government's recommendation to sentence Maxwell to 57 months' incarcerations, which falls at the mid-point of the guideline range.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Maxwell's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol—particularly individuals like Maxwell who assaulted officers.

---

[5] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Maxwell's actions on January 6 were deliberate and dangerous. He put himself at the front of the crowd and then acted out violently by pushing against the police line on the West Plaza, including by pushing a USCP Officer's riot shield and wrestling for control of Officer L.H.'s police baton. In addition, he stayed on the grounds for roughly three hours as the mob around him continued its assaults on police and escalating the chaos.

Maxwell's criminal conduct on January 6, 2021, was intentional. Despite Maxwell taking the stand and telling the Court he did not know he could not be at the Capitol that day and that he had no intent to cause anyone harm, the Court found that, "the defendant's acts and movements that day were not made 'through ignorance, mistake, or accident,' but rather with a full awareness that they would obstruct, impede, or interfere in the police's ability to defend the Capitol." Trial Tr. 11/14/23 at 395. Maxwell's less than candid testimony about his intent and motivations on January 6, and believing that he was different from all the other "bad" people at the Capitol that day, make clear that he presents a risk of repeating this conduct in the future if he is faced with a political outcome he does not like or a political victory he does not support. Moreover, as noted, he has expressed only limited remorse for his crimes. The government's recommended term of incarceration is necessary to specifically deter Maxwell from any such future crimes, to impress upon him the gravity of his crimes, and to promote respect for the law.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

## F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel*

*Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, ... I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6]

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[7]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Christensen*, No. 21-cr-455 (RCL), Christensen was convicted following a jury trial of Civil Disorder, misdemeanor violations of 18 U.S.C. § 111(a) (following an error in the jury instructions), and other associated misdemeanors. Like Maxwell, Christensen joined the West Plaza mob and impeded the officers attempting to maintain the police line. Both Maxwell and Christensen pushed into multiple officers as the mob surged and eventually overwhelmed that police line, and neither actually entered the Capitol. Unlike Maxwell, Christensen did not provide materially false testimony, and thus had a lower combined offense level. Christensen was sentenced to 46 months of incarceration.

---

seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

In *United States v. Sargent*, No. 21-cr-639 (DLF), Sargent pled guilty to Civil Disorder and associated misdemeanors. Like Maxwell, Sargent physically engaged multiple officers during a critical breach moment, pushed into officers, encouraged other rioters. Though Sargent caused property damage, unlike Maxwell, Sargent also pled guilty, accepted responsibility, and did not testify falsely. Sargent was sentenced to 60 months of incarceration, after Judge Friedrich applied the U.S.S.G § 2A2.2 guideline to Sargent's civil disorder conviction.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[8] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Maxwell to pay $2,000 in restitution for his convictions on Counts One, Four, and Five. This amount fairly reflects Maxwell's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 57 months of incarceration, 36 months of supervised release, $2,000 of restitution, and a mandatory special assessment of $100 for Count One and $25 each for Counts Four and Five.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     */s/ Elizabeth N. Eriksen*
ELIZABETH N. ERIKSEN
VA Bar no. 72399
Trial Attorney, Detailee
U.S. Dept. of Justice, Criminal Division
Detailed to the USAO-DC
601 D Street NW
Washington, DC 20530
elizabeth.eriksen2@usdoj.gov
(202) 616-4385

*/s/ Nathaniel K. Whitesel*
NATHANIEL K. WHITESEL
Assistant United States Attorney
DC Bar No. 1601102
601 D Street NW
Washington, DC 20530
nathaniel.whitesel@usdoj.gov
(202) 252-7759

*/s/ Sean J. Brennan*
SEAN J. BRENNAN
Assistant United States Attorney
NY Bar No. 5954128
601 D Street NW
Washington, DC 20530
sean.brennan@usdoj.gov
(202) 252-7125