UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No. 1:22-CR-99-RJL** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **JAKE MAXWELL,** | : | |
| | : | |
| **Defendant.** | : | |

**MOTION TO REVIEW AND RECONSIDER THE TRIAL COURT'S GUILTY VERDICT**

COMES NOW the Defendant, Jake Maxwell ("Mr. Maxwell"), by and through counsel, Michael T. van der Veen and William J. Brennan, and respectfully moves this Court to review and reconsider the Court's guilty verdict on Count I of the Indictment, Civil Disorder in violation of 18 U.S.C. § 231(a)(3) and find Mr. Maxwell not guilty of such offense. In support thereof, the defense states as follows:

On November 14, 2023, following a bench trial before the Honorable Richard Leon, the Court found Mr. Maxwell guilty of one (1) count of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); one (1) count of Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); and one (1) count of Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2). The Court found Mr. Maxwell not guilty of the remaining four (4) charges. On April 29, 2024, Mr. Maxwell appeared before the Court for sentencing. At that time, defense counsel and the Government argued extensively concerning the appropriate guidelines for this case. The Court bifurcated the sentencing hearing which is currently scheduled to resume on August 7, 2024.

In between Mr. Maxwell's first sentencing hearing and the time of this filing, defense counsel has become aware of two (2) similar cases in this District where district court judges found similarly situated defendants not guilty of felony Civil Disorder.[1] Defense counsel, thus, respectfully requests this Honorable Court review and reconsider its guilty verdict as it pertains to the charge of Civil Disorder.

Although there exists no Federal Rule of Criminal Procedure governing motions to reconsider, District Courts have the authority to entertain such motions and reconsider non-final rulings. *United States v. DaSilva*, No. 1:21-CR-00564 (CJN), 2024 WL 519909, at *2-3 (D.D.C. Feb. 8, 2024). "[I]t is a power 'inherent in every court of justice so long as it retains control of the subject-matter and of the parties, to correct that which has been wrongfully done by virtue of its process.'" *Id.* (quoting *Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.*, 249 U.S. 134, 517 (1919)). Therefore, as long as a case and parties are properly before the Court, there exists jurisdiction to correct what had been wrongfully done. *Id.* (citing *Nw. Fuel Co. v. Brock*, 139 U.S. 216, 219, (1891)). Findings of guilt are not final orders, and District Courts have authority to reconsider such findings. *Id.* at 4 (citations omitted). *See also United States v. Mendoza*, 390 F. Supp. 2d 925 (N.D. Cal. 2005)(where the District Court later "reconsidered its guilty verdict, vacated its finding of guilt, and dismissed the indictment.").

Defense counsel respectfully requests this Honorable Court review its guilty verdict, and to specifically review and consider *USA v. Joseph Hicks*, No. 1-2:3-cr-00399-JMC and *USA v. Michael Daniele*, No. 1:23-cr-00143-APM. *Hicks* involved an individual who, unlike Mr. Maxwell, went inside the Capitol, fist bumped another rioter and walked around the Rotunda and

[1]Defense counsel has become aware of additional cases finding defendants not guilty of Civil Disorder, but for brevity purposes we have not included those in this filing.

Statutory Hall. N.T., 6/27/24, p. 7.[2] Mr. Hicks went to the Capitol because he "wanted his voice to be heard and hoped that the election would be overturned." N.T., 6/27/24, p. 7. The Honorable Jia M. Cobb found Mr. Hicks not guilty of Civil Disorder noting and in pertinent part that "Mr. Hicks certainly pushed against the man [in] the olive-green jacket… and there was a scuffle of some sort between them." N.T., 6/27/24, p. 7. Judge Cobb further noted that Mr. Hicks "saw people attacking police and an officer who had been busted in the head." N.T., 6/27/24, p. 7. Judge Cobb went on to state,

> But I cannot find that the government proved that Mr. Hicks committed an act with the intended purpose of obstructing, impeding or interfering with one or more law enforcement officers… For more specificity, the government presented evidence of two incidents in which it contended that Mr. Hicks acted with the intent to impede or obstruct law enforcement officers. First is the event I described earliest where Mr. Hicks is trying to push his way into the building and has an interaction with a man in an olive green jacket. It is clear that Mr. Hicks is trying to gain entry into the Capitol, and it was **not welcoming scene or one where I think any reasonable person would have concluded that they should have been there. But I can't find beyond a reasonable doubt that Mr. Hicks had the intent to impede law enforcement officers at that moment**.

N.T., 6/27/24, pp. 12-13 (emphasis added).

In finding Mr. Hicks not guilty, Judge Cobb declared, "[c]ertainly, at a broad level, Mr. Hicks being physically present in the Capitol made it more difficult for the officers to do their job **because he was a part of the mob**. But I **cannot find that it was his *intent* to obstruct, impede or interfere with law enforcement** based on the video evidence presented at trial." N.T., 6/27/24, p. 15 (emphasis added).

[2] A true and correct copy of the Notes of Testimony from the June 27, 2024, verdict reading transcript is attached hereto as "Exhibit A."

In *USA v. Michael Daniele*, the Honorable Amit P. Mehta found Mr. Daniele not guilty of two (2) counts of Civil Disorder following a non-jury trial.[3] In *Daniele,* Judge Mehta made the following (relevant) findings of fact: first, that Mr. Daniele went to President Trump's speech at the Ellipse and then went to the peace circle where he "encountered a line of bike racks and snow fencing, behind which are a group or were a group of U.S. Capitol Police Officers who were guarding the Pennsylvania Avenue." N.T., 6/14/24, p. 598. Mr. Daniele confronted the line of officers and pushed and pulled on bike racks before additional people began to push the bike racks down and cross the barrier. N.T., 6/14/24, p. 599. While the Officers were attempting to re-establish a barrier, Mr. Daniele's foot comes into contact with the bike rack very briefly. N.T., 6/14/24, p. 599. Mr. Daniele then begins to move forward and steps on the bike rack. N.T., 6/14/24, p. 599. Soon thereafter, an individual backed into Mr. Daniele with the bike rack, causing Mr. Daniele to push the bike rack to the side. N.T., 6/14/24, p. 600. Mr. Daniele would eventually end up "atop a ledge looking southward into the Lower West Terrace…" N.T., 6/14/24, p. 601. While on the Lower West Terrace, Mr. Daniele was pointing with both forefingers and mouthing certain things that the Court deduced was not a "compliment," and did not appear to be "shouting encouragement." N.T., 6/14/24, p. 601-602. Notably, Mr. Daniele walked through the Senate doors, nearly an hour and half after the incident with the bike racks. N.T., 6/14/24, p. 603.

The Court, in finding Mr. Daniele not guilty of the two (2) counts of Civil Disorder stated,

> As to Count 1, I cannot find beyond a reasonable doubt that Mr. Daniele acted with the *intended purpose* of obstructing, impeding or interfering with law enforcement officers when he placed his foot on the bike rack. The evidence showed that Mr. Daniele had his foot on the bike rack only momentarily. The officer was able to continue raising the bike racks, suggesting that Mr. Daniele was not stepping on the bike rack with much force. Mr. Daniele then stepped away from the line and moved forward only after the officers dropped the

[3] A true and correct copy of the Notes of Testimony from the June 14, 2024 verdict reading transcript is attached hereto as "Exhibit B."

> bike rack barriers to fall back to the Lower West Terrace. **During this time, there was no evidence that Mr. Daniele said anything to an officer or any – to any officer, participated in any chanting, or took any other actions suggesting that his intent at the time was to interfere with the officer's performance of his duties.** As to Count 2, I likewise find that I cannot find by a reasonable doubt – I do not find beyond a reasonable doubt that Mr. Daniele acted with the *intended purpose* of obstructing, impeding, or interfering with law enforcement officers **when he took hold of the bike rack and pushed it out of the way and to the ground.** The evidence is undisputed that another person lifted a different segment of the bike rack barrier and pulled back on it just as Mr. Daniele was reaching out his hand to offer an officer the baseball cap that he had picked up. The bike rack barrier moved toward Mr. Daniele. It would have been perfectly natural for him to grab the bike rack and move it out of the way to protect himself. The bike rack posed some danger, as evidenced by the person behind Mr. Daniele jumping onto the ledge and avoid being hit. Also, Mr. Daniele does not do anything immediately after to impede any officer. He stands in the same location for some period of time.

N.T., 6/14/24, 606-607 (emphasis added).

In finding Mr. Maxwell guilty of Civil Disorder[4] in the case at bar, this Honorable Court reviewed the three (3) necessary elements that the government must prove beyond a reasonable doubt. This filing concerns the first element, which is "that the defendant knowingly committed or attempted to commit an act for the intended purpose of obstructing, impeding, or interfering with one or more law enforcement Officers."[5] N.T., 11/14/23, pp. 393-94.[6] As it pertains to the first element, this Honorable Court declared,

> [T]he Court finds, beyond a reasonable doubt, that Mr. Maxwell knowingly committed an act intending to obstruct, impede, or interfere with law enforcement officers. The evidence is clear regarding Mr. Maxwell's movements on the U.S. Capitol grounds

[4] 18 U.S.C. § 231(a)(3) reads, "[w]hoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function—"

[5] There is no dispute regarding elements two (2) and three (3), specifically, that the law enforcement officers were lawfully engaged in their official duties and that the civil disorder adversely effected commerce.

[6] A true and correct copy of the Notes of Testimony from November 14, 2023 is attached as "Exhibit C."

> that day: He entered the south end of the West Plaza between 2:00 and 2:30 p.m. and **watched** as rioters shoved, threw objects at, and attacked officers from the Metropolitan Police Department and the U.S. Capitol Police, who were attempting to hold the line on the west front. Shortly after 2:30 p.m., Mr. Maxwell made his way to the front of the crowd and came face-to-face within a line of officers, who — as Mr. Maxwell himself acknowledged — "were defending the Capitol." With the mob then pressing behind him, Mr. Maxwell surged forward into the police line and, in fact, breached it, eventually coming to rest behind that line. Over the next two-and-a-half hours, Mr. Maxwell moved from his position behind the police line, which collapsed shortly after he left the West Plaza, traveled up to the Lower West Terrace, then the tunnel, and finally the Upper West Terrace; for much of that time, Mr. Maxwell was part of a crowd that included violent rioters, whose assaultive conduct Mr. Maxwell **could not fail to see**. The Court therefore finds that the defendant's acts and movements that day were not made "through ignorance, mistake, or accident," but rather with a full awareness that they would obstruct, impede, or interfere in the police's ability to defend the Capitol. The Court additionally finds that Mr. Maxwell, who deliberately cut a path to the front of the mob and the police line, and who joined in a crowd that he knew included assaultive rioters, did so with the "intended purpose" of obstructing, impeding, or interfering with the police's mandate to protect the Capitol and its inhabitants and to clear the grounds of all demonstrators. As such, the Court finds the first element of civil disorder is satisfied in Mr. Maxwell's case.

N.T., 11/14/23, pp. 393-396(emphasis added).

Remembering that this Honorable Court acquitted Mr. Maxwell of two (2) charges of Assault, defense counsel submits Mr. Maxwell actions did not demonstrate an intent to obstruct, interfere, or impede the Capitol Police Officers ("CPD") or Metropolitan Police Department ("MPD") Officers from doing their respective jobs similar to the finding of the Court in *Hicks*. But here, the Court found only that Mr. Maxwell "*watched* as rioters shoved, threw objects at, and attacked officers from the Metropolitan Police Department and the U.S. Capitol Police." N.T., 11/14/23, at 394. Like Mr. Hicks, Mr. Maxwell's presence at the Capitol to witness and protest did not, by itself, interfere, impede, or obstruct CPD and MPD Officers abilities to do their job.

Much like Mr. Daniele's case, Mr. Maxwell reacted to circumstances and not done with the intended purpose of interfering with the duties of law enforcement on January 6, 2021. Further, much like Mr. Daniele, Mr. Maxwell stood in the same location for some period of time, not doing anything to impede any officer. If Mr. Daniele was found not guilty of Civil Disorder when he pushed a bike rack barrier out of the way and stepped over it, the defense respectfully argues Mr. Maxwell is also not guilty of the same offense for his mere presence that day.

Both the *Hicks* and *Daniele* cases mentioned above, involve defendants who were doing more than being present at or around the Capitol on January 6, 2021, standing to bear witness, and having their voices heard. Both cases involved defendants who went inside the Capitol, contributing to the breach of the Capitol, and therefore, created a greater likelihood of interfering with the duties of officers. The Court in *Hicks* and in *Daniele* were not persuaded that those defendants intended to interfere with law enforcement. The defense here suggests this Honorable Court should deduce that persons acting with greater severity than Mr. Maxwell on January 6th – that is by going *inside* the Capitol, at least two judges of the court concluded the Government could not show criminal intent shown beyond a reasonable doubt upon similar evidence to the present case.

Mr. Maxwell, and all the other individuals present at or around the Capitol on January 6, 2021, made the jobs of CPD and MPD Officers jobs more difficult, but that was not Mr. Maxwell's, nor Mr. Hicks', not Mr. Daniele's intent. They sought a hearing. Protest was their intent. Their intent was to witness, not to interfere with the duties of the law enforcement officers. As the evidence demonstrated at trial, Mr. Maxwell listened to the orders of the CPD and MPD Officers at the front line, and at the area behind the front line on January 6, 2021. In fact, police officers told Mr. Maxwell (and his father) to stay in a specific area behind the police line when the two (2)

of them attempted to escape the mayhem. Mr. Maxwell followed this order. Mr. Maxwell did not obstruct, interfere or impede with any officers' ability to do their jobs. Mr. Maxwell followed the instructions officers gave him. Mr. Maxwell's actions on January 6, 2021, constituted the opposite of interfering, impeding or obstructing officers. Indeed, Mr. Maxwell was one less person that the police officers had to worry about controlling, and therefore, effectively, assisted their efforts to protect the Capitol and control the crowd by heeding commands.

It is important to note that in anticipation of the crowds of people expected on January 6, 2021, CPD and MPD Officers were specifically requested to help control crowds and groups of people. Mr. Maxwell, while part of the expected crowd for whom officers were already present, listened to the orders of law enforcement personnel doing nothing to interfere with the job of CPD and MPD Officers. Those officers were present for the specific purpose of controlling the crowd, and Mr. Maxwell, by submitting to commands, allowed himself to be controlled. The defense suggests that behavior is the opposite of making officers' job more difficult?

This Honorable Court has an interest in preventing both sentencing and verdict disparities. Granting Mr. Maxwell's request for an acquittal on the charge of Civil Disorder will help ensure the final verdict will be consistent with other decisions of this court made on similar evidence. See *Hicks* and *Daniele*, *supra*. "Interfere, impede, and obstruct" are not statutorily defined, as discussed at length in Mr. Maxwell's Motion to Dismiss, leaving case decisions within the District as the only authority suggesting what those definitions are. The defense suggests that this Honorable Court will advance the interests of justice by acquitting Mr. Maxwell of Count I of the Indictment, Civil Disorder.

**WHEREFORE**, Mr. Maxwell respectfully moves this Court to reconsider and review the Court's guilty verdict, and find Mr. Maxwell not guilty of Count 1 of the Indictment, Civil Disorder, a violation of 18 U.S.C. § 231(a)(3).

Respectfully Submitted,

Date: August 1, 2024

/s/ Michael T. van der Veen
Michael T. van der Veen
Attorney for Defendant
Pennsylvania Bar No. 75616
van der Veen, Hartshorn, and Levin
1219 Spruce Street
Philadelphia, PA 19107
P: (215) 546-1000
F: (215) 546-8529
mtv@mtvlaw.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 1st day of August, 2024, a copy of the foregoing *Motion to Review and Reconsider the Trial Court's Guilty Verdict* was electronically filed with the Clerk of the United States District Court using CM/ECF, with a notice of said filing to the following:

Counsel for the Government:

Elizabeth N. Eriksen
1301 New York Ave., N.W., Room 849
Washington, DC 20530
P: (202) 616-4385
Elizabeth.Eriksen@usdoj.gov

/s/ Michael T. van der Veen
Michael T. van der Veen, Esq.

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

JOSEPH KERRY HICKS,

Defendant.

Criminal Action
No. 1:23-cr-00399-JMC

June 27, 2024
10:00 a.m.

Washington, D.C.

---

**TRANSCRIPT OF THE VERDICT**
**BEFORE THE HONORABLE JIA M. COBB**
**UNITED STATES DISTRICT JUDGE**

APPEARANCES:

For the Government:

Michael Lawrence Barclay
USAO
601 D Street NW
Washington, DC 20530

Kathryn E. Bolas
U.S. ATTORNEY'S OFFICE
District of Columbia
601 D Street NW
Washington, DC 20530

For the Defendant:

Diane Aimee Shrewsbury
OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE DISTRICT OF CO
625 Indiana Avenue NW
Suite 550
Washington, DC 20004

(APPEARANCES CONTINUED:)

For the Defendant:

Ubong E. Akpan
FEDERAL PUBLIC DEFENDER FOR THE DISTRICT OF COLUMBIA
625 Indiana Avenue, NW
Suite 550
Washington, DC 20004

Court Reporter:

Stacy Johns, RPR, RCR
Official Court Reporter

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription

**P R O C E E D I N G**

(Defendant present via Zoom.)

COURTROOM DEPUTY: Your Honor, we're on the record in criminal case 23-399, United States of America versus Joseph Kerry Hicks.

Starting with government counsel, please approach the podium and state your appearance for the record.

MR. BARCLAY: Good afternoon, Your Honor. Michael Barclay and Katherine Bolas for the United States.

THE COURT: Good afternoon.

MS. SHREWSBURY: Good afternoon, Your Honor. Diane Shrewsbury and Ubong Akpan for Mr. Hicks. Mr. Hicks is present via video.

THE COURT: Okay. And Mr. Hicks had waived his presence for this hearing.

MS. SHREWSBURY: Yes, Your Honor. We filed the waiver on the docket.

THE COURT: Okay. So we are here for the verdict. I will read that. And I will also be filing on the docket a verdict form that memorializes just the verdict, but I'm going to put my findings on the record now.

So the parties are before the Court for my findings of fact and verdict after a two-day bench trial. Mr. Hicks was charged with five counts: Count 1, obstructing officers during a civil disorder; count 2 entering or remaining in a restricted building or grounds; count 3, disorderly or disruptive conduct in a restricted building or grounds; count 4, disorderly conduct in a Capitol building; and count 5, parading, demonstrating or picketing in a Capitol building or grounds.

I'm going to start with my findings of fact and I find as follows: Beginning with Mr. Hicks's conduct before January 6, 2021, the evidence established beyond a reasonable doubt that following the presidential election on November 4th, 2020, Mr. Hicks was frustrated about what he believed was a fraudulent election.

To be clear, there's nothing criminal about his belief whatsoever, but the Court is recounting evidence that provides some insight into Mr. Hicks's beliefs as they may relate to his

intent for some of the offenses charged.

In an interview with law enforcement officials, Mr. Hicks confirmed that he believed the 2020 election was rigged and stolen, and that's from Government Exhibit 501 at 27:31.

In the weeks leading up to January 6, 2021, Mr. Hicks made various Internet searches for topics related to the election and the vice president. The circumstantial evidence presented is more than sufficient for the Court to conclude that Mr. Hicks made those searches.

The subscriber information shows that the searches were made on his device or Google account and related to topics and thoughts that he expressed in his conversations with law enforcement.

The Court can use its common sense in evaluating evidence, and it is too much of a leap for me to conclude that someone else was responsible for the search history on Mr. Hicks's account and devices under the circumstances that I described.

So I do find that Mr. Hicks visited the Wikipedia pages for "U.S. presidential line of succession" and "vice president of the United States," which is in Government's Exhibit 701.2. He also visited a website with the title "Impeachment and Removal From Office," which is Government's Exhibit 701.2 again.

And he viewed a video, or at least pulled up a video, titled, "Examining Irregularities in the 2020 Election" and another video titled, "Full Phone Call, Trump Pressures Georgia Secretary of State to Recount Election Votes," and that's Government's Exhibit 701.3.

The Court does not know how much of the sites or pages or videos he viewed or the content of those videos or sites at the time that he viewed them. There was no evidence that was presented during the trial to that effect. So the information that the Court recounted is the only information that the Court has about the various sites and videos that Mr. Hicks accessed before he visited the Capitol on January 6th.

And according to Mr. Hicks, he traveled to Washington, D.C. on January 5th, 2021, because he wanted his voice to be heard and hoped that the election would be overturned. That's from Government's Exhibit 500 at 4:10.

On January 6, 2021, Mr. Hicks was wearing a red baseball cap with the words "Trump, Make America Great Again 2020," sunglasses, a red and blue patterned gaiter, a red sweatshirt, a black jacket, black and yellow gloves and jeans. He also carried a flagpole bearing a black flag which depicted a red, white and blue skull with "3 Percent" in one of the eyes and the words "We Are Everywhere" in white text underneath. And that is from Exhibit 900, which is stipulation one, as well as Government's Exhibit 400, which shows a photo of Mr. Hicks

with this flag.

A photo that the government admitted at trial shows Mr. Hicks in front of the Washington Monument on January 6th holding his flag. That's Government Exhibit 400. It's not clear from the evidence, at least as far as the Court can tell, the precise time the photo was taken, although it is clear that it was taken on January 6th, given where Mr. Hicks was, his clothes and all the other evidence presented during the trial that makes it clear that that was a photo taken on January 6th.

The government argued at trial that Mr. Hicks attended a Stop the Steal rally at the Ellipse before making his way to the Capitol building, but I cannot make that conclusion from the evidence.

In his custodial interview, Mr. Hicks said that he attempted to enter the rally but was told that he could not enter with his flag. Specifically, he told law enforcement: We were told don't bring your flags because they're taking flags. That's Government's Exhibit 501 at 30:45.

Another statement that he made to law enforcement was: When I went to the Ellipse, I was trying to get into the Ellipse but couldn't. And he also told law enforcement that he didn't get in. And that's, again, from the recorded custodial interview, Exhibit 501. And I'm citing from approximately 30:45 to 31.

Although Mr. Hicks made reference to President Trump's

speech in his interview with law enforcement, it's not exactly clear to the Court whether Mr. Hicks was referring to watching that speech in realtime or watching a recording afterwards. For example, Mr. Hicks speaking to law enforcement makes the statement, quote: And they're saying Trump didn't say peacefully go out and protest. Yes, he did. That was on tape. There's a video.

And that's at Government's Exhibit 501 at 31:40.

But regardless, at 2:41, the evidence clearly establishes that Mr. Hicks entered the Capitol building, Government's Exhibit 109 at the five-minute mark.

Mr. Hicks then milled around the Capitol building. He walked through the Rotunda and Statutory Hall. He waved his flag around and fist bumped another rioter. That's Government's Exhibit 109 at 6:55.

And while he was in the Rotunda, there was clearly a civil disorder and riot taking place. There were people climbing statues, leaving paraphernalia related to President Trump around the room. One example is from Government's Exhibit 109 at 7:15 and 11:53.

The evidence establishes that Mr. Hicks was in the Capitol for about 18 minutes and he then exited through the Rotunda doors. That's also from Exhibit 109 at 23:30.

About a half an hour later, around 3:30 p.m., Mr. Hicks returns to the Capitol building. At the same time

that Mr. Hicks approached the building for the second time, there were law enforcement officers inside the building who were trying to push people out of the Capitol and regain control of the building. And that's Government's Exhibit 108 at 2:50.

The scene at the doorway was loud and chaotic. That's demonstrated in Government's Exhibit 200. There were chemical agents and homemade chemical concoctions that were being blasted from law enforcement officers, but also rioters. Officer Mendoza of the Capitol Police testified that chemicals were being deployed by both sides. I would also refer to Government's Exhibit 108 at 2:50.

Officer Choi also testified about the chaotic scene at the time. In fact, in the confusion, Officer Choi testified that he accidentally pushed another police officer outside of a door because he mistook the officer for a rioter. And that's from his testimony and demonstrated in Government's Exhibit 200 at the two-minute mark.

Mr. Hicks attempted to reenter through the doorway. He joined a group of people standing just outside the doorway, and this put him behind a tall man wearing an olive green jacket, who was the subject of much argument during the trial. This is in Government's Exhibit 108 at 2:50.

There were rioters in between Mr. Hicks and the law enforcement officer officials inside, and from the views of the

various videos introduced at trial, it's not clear to the Court whether Mr. Hicks saw the officers in the doorway who were standing on the other side of the rioters.

Mr. Hicks certainly pushed against the man in the olive green jacket. That's Government's Exhibit 108 at 2:55. And there was a scuffle of some sort between them. Seconds later, a large crowd pushed out of the building and passed Mr. Hicks, who was still just outside the doorway. At this point the man in the olive green jacket also walked away from the building and out of the frame. I'm at Government's Exhibit 108 at 3:19.

After the man in the olive green jacket left, Mr. Hicks turned his back to the now visible police line and faced way from the building. That's clear from Government's Exhibit 108 at 3:35.

An officer wearing black gloves then pulled Mr. Hicks by his jacket backwards for a few steps, and when the officer let go of him Mr. Hicks's sweatshirt rebounded and he walked out of the doorway to the outside of the building. That's from Government's Exhibit 108 at 3:39. Mr. Hicks then left the area.

The parties stipulated that the U.S. Capitol Police officers, Metropolitan Police Department officers and other law enforcement officers present at the U.S. Capitol on January 6, 2021, were engaged in their official duties by policing the

Capitol building and grounds and enforcing federal law and D.C. law in those areas.

The parties have also stipulated that the vice president, a Secret Service protectee, was present in the Capitol. And the stipulations, just for purposes of the record, are contained at Government's Exhibit 900. And specifically, I'm referring to there was stipulated testimony of a Secret Service special agent, Elizabeth Glavey.

Based on the evidence presented at trial, the Court does find beyond a reasonable doubt that the events of January 6th negatively impacted businesses in Washington, D.C. Safeway stores, for example, made between 14 percent and 56 percent less in sales due to the safety-related closures and inability to receive shipments from out of state. And that's clear from Government's Exhibits 13 through 16, which I fully credit.

Following January 6, 2021, Mr. Hicks twice spoke to FBI agents investigating his actions on January 6, 2021. During his first interview, Mr. Hicks admitted that he was inside the building. That's at Government's Exhibit 500 at 6:40.

He acknowledged that he saw people attacking police and an officer who had been busted in the head. Government Exhibit 500 at 7:45 and at 8:40.

And during a second interview, which took place in

2023, Mr. Hicks explained that his behavior was, he thought, justified. He explained that, quote, that's the people's house and we have every right to go in there and walk around. That's at Government Exhibit 501 at 18:05.

And he also was clear as to why he went to the Capitol that day. He made -- told law enforcement that his goal was to go and stand on the steps and protest and let his voice be heard because it was a rigged election and a stolen election. And he was there because he thought that Congress was going to overturn the election. And that's from Government's Exhibit 501, 27:38 and 28 through 50.

So with those factual findings, I now announce my verdict. As to count 1, 18 U.S.C. section 2231(a)(3), obstructing officers during a civil disorder, the elements are:

One, that defendant knowingly committed an act with the intended purpose of obstructing, impeding or interfering with one or more law enforcement officers.

Two, at the time of the defendant's actual or attempted act, the law enforcement officers were engaged in the lawful performance of their official duties incident to and during a civil disorder.

And third, that the civil disorder in any way or degree obstructed, delayed or adversely affected commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.

Elements two and three are not really in dispute. And as I indicated in my findings I find beyond a reasonable doubt that the evidence amply satisfies -- the government satisfied proving those elements.

Specifically, the parties' stipulation, the video evidence that I've already referred to and the other evidence cited in my findings of fact establishes beyond a reasonable doubt that what occurred on January 6th was a civil disorder and that the impact -- these events had an impact on commerce, for example, Safeway stores.

But I cannot find that the government proved that Mr. Hicks committed an act with the intended purpose of obstructing, impeding or interfering with one or more law enforcement officers. So Mr. Hicks is not guilty of count 1.

For more specificity, the government presented evidence of two incidents in which it contended that Mr. Hicks acted with the intent to impede or obstruct law enforcement officers.

First is the event I described earlier where Mr. Hicks is trying to push his way into the building and has an interaction with a man in an olive green jacket. It is clear that Mr. Hicks is trying to gain entry into the Capitol, and it was not a welcoming scene or one where I think any reasonable person would have concluded that they should have been there.

But I can't find beyond a reasonable doubt that

Mr. Hicks had the intent to impede law enforcement officers at that moment. I can't be sure what he saw, what he was aware of, that he knew law enforcement officers were behind the group of rioters when he was trying to push his way in or whether he was just under the impression that the door was congested because of the mob of rioters and he was trying to make his way through a crowd.

In other words, I don't know that if there had been a visible line of officers at the door, that Mr. Hicks would have behaved the same or tried to push beyond the officers. The scene was chaotic with many loud noises and a lot of people, and there was a haze of smoke or some chemicals in the video but Officer Mendoza testified that the chemicals were being deployed by both sides.

So based on that testimony, I can't conclude that Mr. Hicks would have known from that smoke alone that there were officers in the vicinity that were deploying those chemicals.

Mr. Hicks's counsel during closing argument presented a plausible explanation for his conduct as it relates to his interactions with the person in the green jacket, that I can't find did not happen beyond a reasonable doubt. Namely, that he was looking at this person, focused on that person and got into a scuffle of some sort with that individual.

Second, the government argues that shortly after this

first incident that I described that Mr. Hicks backed into an officer to try to push his way into the building. By this point, the officers were clearly at the door, and Mr. Hicks turned his back and tried to push them out the way. I would have no problem concluding that the government satisfied this element beyond a reasonable doubt.

But a close examination of the video does show that an officer pulled Mr. Hicks into the building and that as soon as Mr. Hicks was released he stepped away from the doorway and left the area. I watched the video very carefully after closings. It is clear he's being pulled back. Not only because I can see the officer grab the back of Mr. Hicks's sweatshirt but because I can see the hood of his jacket spring back up after the officer's hand moves. And the only plausible explanation for his hood doing that is that an officer grabbed him and released him.

So his moving back towards the officers was not voluntary, and after the officer released him, he walks away. If his aim had been to break through the line of officers, there's certainly nothing that was preventing him from trying again or engaging in more aggressive tactics to get past them. Certainly, there were many other people that day who did that, as the videos depict.

Certainly, at a broad level, Mr. Hicks being physically present in the Capitol made it more difficult for

the officers to do their job because he was part of the mob. But I cannot find that it was his intent to obstruct, impede or interfere with law enforcement based on the video evidence presented at trial.

Count 2, 18 U.S.C. 1752(a)(1), entering or remaining in a restricted building or grounds. The elements of that count are, one, that the defendant entered or remained in a restricted building or grounds without lawful authority to do so; and two, that the defendant did so knowingly, meaning, A, that he knew that he entered or remained without lawful authority; B, in what he knew to be a posted, cordoned off or otherwise restricted area; and finally, that he knew that the restricted area was a building or grounds where the president or other person protected by the Secret Service was or would be temporarily visiting.

And the parties are certainly aware that there is a bit of a split in this district about whether the defendant has to know that the restricted area was a building or grounds where a Secret Service protectee would be temporarily visiting. As my legal instructions make clear, I've concluded that the defendant does have to know that, and I cannot make that finding beyond a reasonable doubt based on the evidence presented at trial. So I will acquit Mr. Hicks and find him not guilty of count 2.

The government had argued and attempted to prove at

trial that Mr. Hicks knew Vice President Mike Pence would be present at the Capitol on January 6th because he listened to then President Trump's speech and made reference to the speech, which made reference to vice president, and his Internet searches demonstrate his awareness that the vice president would be visiting the Capitol and his understanding of the vice president's role in the process.

As I indicate in my findings of fact, I don't know that Mr. Hicks actually attended that speech. Again, in his FBI interview he stated that although he planned to attend the speech, he wasn't actually able to get in the area where the president would be speaking.

And there's a photograph of him in the area of the Washington Monument but I don't know when that photograph was taken in relation to the speech, whether he actually saw the speech in that area. And if I credit Mr. Hicks's statement to law enforcement, he was not there for the speech. Given his other admissions about his conduct that day, I'm not sure why he would have denied hearing the speech if he was there.

And as I indicated earlier, it's not clear from the statements that Mr. Hicks made in his custodial interview about President Trump's words whether he was talking about something that was related to him that day, that he saw that day or something he learned after.

His reference to there being a video of President

Trump telling people to demonstrate peacefully, which was made years after the date in question, is a little bit ambiguous as to whether he watched the speech in person or a recording afterwards. If he was talking about something he saw that day, it seems a bit odd that he would refer to there being a video of the statement.

And then finally, I can't conclude from Mr. Hicks's search history that Mr. Hicks read, learned or confirmed anything about the vice president being at the Capitol. That's not in the title of any of the searches and I don't know if you go to the vice president's Wikipedia page what it says about that officer's role in the certification process or whether Mr. Hicks even saw that on that page, for example.

There was no evidence presented at trial about what the contents of those videos were or what was on those pages. So I just have to go by the titles.

As to count 3, 18 U.S.C. 1752(a)(2), disorderly or disruptive conduct in a restricted building or grounds, I find Mr. Hicks not guilty for the same reasons as I found him not guilty in count 2, because element two of that charge is the same as an element of count 2.

As to count 4, disorderly conduct in a Capitol building, I find Mr. Hicks guilty of count 4. I find beyond a reasonable doubt that the government proved all the elements of that offense.

First, Mr. Hicks engaged in disorderly or disruptive conduct in a Capitol building or grounds. Among the evidence that I cited in my factual finings, Mr. Hicks entered the Capitol. He was in the Rotunda area. It was clear from the videos that he should not have been there.

He was part of a large mob that overtook the Capitol. And his presence as part of the mob, including parading his flag around the Rotunda for 18 minutes in the midst of the mob, trying to force his way through the doors, getting into at least one skirmish with another rioter, that was clearly disruptive and disorderly behavior, which is evident from the videos.

I do find that he intended to engage in that behavior with the specific intent to impede, disrupt or disturb the orderly conduct of a session of Congress. In other words, he did so with the intent to disrupt or disturb Congress.

By his own account, Mr. Hicks came to Washington, D.C. with the express purpose of protesting what he believed to be a rigged election, and his goal, as stated by him, was to cause a recount of the votes by the states.

He clearly understood that something related to the election that he believed to be fraudulent was taking place at the Capitol that day, from his own admissions to law enforcement, and he admits that he was there to try to prevent that from happening and to try to achieve his outcome.

With respect to the last element, I find beyond a reasonable doubt that Mr. Hicks acted willfully and knowingly. That's clear from the evidence and his statement to law enforcement. His conduct certainly wasn't the result of inadvertence or mistake. So Mr. Hicks is guilty of count 4.

As to count 5, parading, demonstrating or picketing in a Capitol building, I find Mr. Hicks guilty of count 5. I find beyond a reasonable doubt that Mr. Hicks paraded, demonstrated or picketed in a U.S. Capitol building or grounds. He admitted that at minimum he was demonstrating at the Capitol and the video evidence clearly depicts him parading and demonstrating inside the Rotunda area and on Capitol grounds, waving his flag.

And I find that he acted willfully and knowingly. Again, video evidence and Mr. Hicks's statements make clear that his actions were not inadvertent or mistaken. He admits that he was at the Capitol to demonstrate. And that's what the evidence establishes beyond a reasonable doubt. So Mr. Hicks is guilty of count 5.

So that's my verdict and I believe we just need to set a date for sentencing. So we can propose a date and see if that works for the parties.

COURTROOM DEPUTY: Will September 17th at 10:30 a.m. work?

THE COURT: Does that work for the parties?

MS. SHREWSBURY: Your Honor, I would just raise that I believe probation in cases where the person is released asks for 120 days instead of 90 days.

COURTROOM DEPUTY: It's back to the 90 days.

THE COURT: It's back to 90.

MS. SHREWSBURY: Your Honor, can we do a virtual since it's just the 5104s?

THE COURT: Any objection from the government?

MR. BARCLAY: No objection.

THE COURT: Okay. And does that date work for you? I should have asked.

MR. BARCLAY: The government can do that date.

THE COURT: September 17th at 10:30 a.m. for sentencing by Zoom.

MS. AKPAN: I apologize, Your Honor. I actually have a trial. I'll be in trial the 17th. I was looking at the wrong week.

THE COURT: Okay. Can we do it the following week?

DEPUTY CLERK: We're in trial.

THE COURT: We're in trial? Which trial is that? Can we set it on a Friday? We're going to pick a date.

COURTROOM DEPUTY: That Friday is not good, Your Honor.

THE COURT: Okay. Just pick another.

(Off-the-record discussion.)

COURTROOM DEPUTY: We can do September 27th at 1:00 p.m.

MS. AKPAN: That's fine for us. Thank you.

THE COURT: Does that work for the government?

MR. BARCLAY: That's fine.

THE COURT: Okay. That will be by Zoom. So I will ask the parties to submit sentencing memos by September 13th and any replies by September 20th. And then sentencing September 27th.

Anything else that we need to discuss?

MS. AKPAN: Nothing further, Your Honor.

THE COURT: From the government?

MR. BARCLAY: No.

THE COURT: Thanks, everyone. See you back in September.

(Proceedings concluded at 3:01 p.m.)

C E R T I F I C A T E

I, Stacy Johns, certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

/s/ Stacy Johns Date: July 19, 2024

Stacy Johns, RPR, RCR
Official Court Reporter

# EXHIBIT B

he'll bring it back to me.

Thanks, everyone.

COURTROOM DEPUTY: All rise.

This Court is now in recess.

(Recess from 11:19 a.m. to 4:28 p.m.)

COURTROOM DEPUTY: Your Honor, we're now calling for the record Criminal Action 23-143, United States of America versus Michael Daniele.

And present on behalf of the defense we have the defendant, as well as Stuart Kaplan.

For the government, we have Ms. Caroline Jackson.

THE COURT: All right. Good afternoon again, everyone. Apologies for taking so long. I wanted to -- between a few tech issues, I wanted to make sure I got through all of evidence. It took a little longer than I anticipated.

So unless there's anything either side wishes to discuss, let me go ahead and deliver the verdict here.

So the government's accused Michael Daniele of offenses relating to the events of January 6th of 2021 at the United States Capitol Building.

Mr. Daniele is charged with six offenses:

Count 1 for obstructing officers during a civil disorder at the Peace Circle;

Count 2 for obstructing officers during a civil

disorder at the Lower West Terrace;

Count 3 for entering and remaining in a restricted building or grounds;

Count 4, disorderly and disruptive conduct in a restricted building or grounds;

Count 5, disorderly conduct in a Capitol Building.

And Count 6, parading, demonstrating, or picketing in a Capitol Building.

Let me begin by making the following findings.

Prior to January 6th and on the day itself and according to the testimony of inspector Lanelle Hawa of the U.S. Secret Service, whose testimony from a prior trial was admitted into evidence, U.S. Capitol Police had established a security perimeter for the certification of the Electoral College vote.

According to Captain Ronald Ortega, the security perimeter was visible and established with bike racks, snow fencing, and "Area Closed" signs affixed to the bike racks and snow fencing. This fact was confirmed by multiple exhibits.

Captain Ortega testified that no demonstrations were authorized within the secure perimeter. The building itself was closed to the public.

Vice President Pence came to the U.S. Capitol that day to preside over a joint session of Congress to certify

the Electoral College votes. He and his family, who are protectees of the U.S. Secret Service, arrived at the U.S. Capitol at 12:30 p.m. The joint session began at 12:59 p.m. in the House Chamber.

After an objection was lodged to the first state's electoral votes, the houses split and retired to their respective chambers. Vice President Pence briefly presided over the Senate debate and then went to his office.

Inspector Hawa testified that sometime after 1:15 p.m., she began to hear radio transmissions indicating large crowds were gathered outside the Capitol Building. Eventually, she learned that the building had been breached.

The decision was then made to move the Vice President and his family to a secure location. That occurred at approximately 2:25 p.m. According to Inspector Hawa, the Vice President remained in the secure location until later that evening for approximately five hours. Inspector Hawa testified it was not advisable to bring the Vice President back to either the House or Senate chambers until the building had been cleared.

Video evidence showed that the first breach of the Capitol Building itself took places at 2:13 p.m. through the Senate Wing doors. At about the same time, the Senate recessed, and the House initially recessed at 2:18 p.m. and then resumed at 2:26 p.m. It recessed again at 2:29 p.m.

The certification proceedings resumed sometime after 8:00 p.m.

Mr. Daniele left his home in New Jersey for Washington, D.C., on the morning of January 6 to attend the Stop the Steal event.

Upon arriving in D.C., Mr. Daniele, dressed in a dark jacket and blue jeans, proceeded to the Mall in the area relatively close to the Washington Monument. There, video evidence and his own testimony established that Mr. Daniele was present for a portion of President Trump's speech at the Ellipse. Video evidence showed that President Trump's voice could be heard from Mr. Daniele's location on the Mall, but Mr. Daniele disputed that he was able to hear what the President was saying.

Mr. Daniele left the Mall before President Trump's speech ended. At the first -- at first, he could be seen in front of the reflecting pool on the west side of the Capitol, and eventually he made his way to the Peace Circle. There, Mr. Daniele, with a large and growing crowd of people, encountered a line of bike racks and snow fencing, behind which are a group or were a group of U.S. Capitol Police officers who were guarding the Pennsylvania Avenue walkway. At least one "Area Closed" sign appeared on the bike racks. This was around 12:50 p.m.

Within about five minutes, mayhem broke out.

A number of individuals, none of whom are Mr. Daniele, began to confront the line of officers, eventually pushing and pulling back on the bike racks. Eventually the bike racks were pushed down and the individuals started to come across the barrier. At this point, Mr. Daniele remained behind the bike racks. If one were facing the Capitol at this point, Mr. Daniele is at the far right of the group.

During the struggle, officers attempted to stand the bike racks back up. The officer in front of Mr. Daniele attempted to raise the bike rack in front of him. As he did so, Mr. Daniele's right foot, wearing a tan boot, can be seen making contact with the bike rack. His foot comes off the rack almost immediately, and the officer is able to continue lifting the bike rack. It appears that a second or so later, Mr. Daniele's boot is a few feet back from the police line. The crowd, nevertheless, remained defiant and rowdy. Eventually, the officers dropped the bike racks to the ground.

At this point, the snow fencing had separated from the bike rack. What appears to happen at this point is that Mr. Daniele reaches down and pulls back the snow fencing to move it out of his way. As the crowd appears -- excuse me -- begins to move forward, Mr. Daniele does so too. He steps on to the bike rack, which is now flat on the ground.

Once he is on the other side of the bike rack,

Mr. Daniele bends down to pick up at least a baseball cap that has fallen from an officer's head. That hat turned out to belong to Officer Cruz. After picking up the hat, Mr. Daniele walked up the stairs and then began a brisk walk or jog towards the Capitol Building, specifically the Lower West Terrace. And as he made his way up the walkway, he passed through another bike rack -- set of bike rack barriers which had opened up.

Mr. Daniele had arrived at the Lower West Terrace shortly afterwards with ball cap in hand. There, he encountered another bike rack barrier with officers behind it. As he approached the bike rack, Mr. Daniele extended his arms toward one of the officers to offer the cap to the officer, who accepted it.

At about the same time, another person who was to the left of Mr. Daniele lifted up on one of the bike racks and unhooked it from the other. That same person began to drag the bike rack back, and the rack is -- in that time is being opened back into -- being pushed back into Mr. Daniele. Mr. Daniele grabbed ahold of the bike rack and pushed it to the side. As the bike rack was dragged back, the person behind Mr. Daniele jumped on to a concrete ledge.

At some point, not clear how long after, Mr. Daniele moved forward; that is, beyond where the bike rack barrier once stood. He can be seen in one of the

government's exhibits moving north across the Lower West Terrace. He eventually ended up standing atop a ledge looking southward into the Lower West Terrace, where officers were lined up keeping the crowd at bay.

At one point, Mr. Daniele is looking toward the Capitol and cups his mouth to his hand and appears to yell something in the direction of the Capitol Building, where officers can be seen crossing on the Upper West Terrace. I do not know, of course, what he said.

Soon afterwards, the crowd surged forward towards the Upper West Terrace. Mr. Daniele evidently did so too, because later, although not clear how long, he can be seen in the front of a line of officers on the Lower West Terrace, both mouthing something and pointing at them with both forefingers. Again, we do not know what he said, but from his body language, he was not paying them a compliment, it appears.

Later in the same video, he can be seen pacing and cupping his mouth and seemingly yelling in the direction of the police. Again, we don't know what he said, but he did not appear to be shouting encouragement. When this is occurring, he appears to be no more than 15 feet from the line of officers.

Around this same time, Mr. Daniele is within feet of a line of officers. He can be seen with his arms raised

and middle fingers extended in the direction of the Capitol Building.

Mr. Daniele testified that he was flipping the bird or that his flipping of the bird was directed to the "establishment," because the police were outnumbered, and also, in his mind, there was wasteful spending of money.

Eventually, Mr. Daniele made his way back to the south end of the Lower West Terrace, away from the crowd, but positioned between two bike rack barriers. He may have hopped a fence on the way to get there. It's not exactly clear the timing of it all, but it may have been that he hopped a fence to get to that part of the Lower West Terrace. There he can be seen on his cell phone, and in the immediate vicinity are two officers behind barriers.

Later, Mr. Daniele made his way back across the Lower West Terrace toward the north end. He ended up in front of the scaffolding on the north side, in front of the entry door to that scaffolding.

Initially, the crowd is being held back by the police, but eventually the crowd surges forward. Mr. Daniele is part of the group.

As the group moves forward, so does he. The video evidence shows Mr. Daniele appearing to shout as he is moving forward with the group. Again, we don't know what

his words were; but, nevertheless, he remains in the crush of people as they move underneath the scaffolding.

According to Mr. Daniele, while he was underneath the scaffolding, he was hit with pepper spray in the face. That did cause him to come out from underneath the scaffolding. It appears that he did so around the time a line of MPD riot officers arrived at the Capitol. Mr. Daniele is near those officers. He evidently is having trouble seeing, based upon the video evidence, and is clearly affected by the pepper spray and, in fact, appears to take some water to clean his eyes out.

He then appears to climb the stairs that are next to the scaffolding, and then, in fact, ducks underneath the scaffolding and makes his way to the Upper West Terrace, where initially he can be seen walking away from the Senate Wing doors.

Eventually, Mr. Daniele does find the Senate Wing doors, and he enters them at approximately 2:19 p.m. Approximately -- this is approximately 19 -- 90 minutes, excuse me, after Mr. Daniele has arrived at the bike racks at the Peace Circle.

Mr. Daniele walks in through the Senate Wing doors with phone in hand. He immediately looks down, turns to his right, and he sees a man jump through the broken window. He takes a photograph of that broken window. At the time, he

does not appear to be in any distress. At no point, for example, does he wipe his eyes or reach for his eyes. There are at the time no police officers in the hallway as he has entered in -- when he enters into the Senate Wing doors -- through the Senate Wing doors.

Mr. Daniele then walks down the hallway toward the Crypt. Before he gets there, he hands his phone to someone and has his photo taken of him with his arms extended. He then enters the Crypt at around 2:22 p.m. He walks around for a bit, appears to take some photos and, again, during this time, does not appear to be in distress. At some point he can be seen jumping as if to look over the crowd. He then turns around and walks out of the Crypt two minutes later at 2:24 p.m. He walks back down the hall and leaves through the Senate Wing doors. After exiting the Capitol, according to Mr. Daniele, he headed back to the bus, and then returned home.

Following January 6th, Mr. Daniele was interviewed by the FBI but not arrested on that date. He was not arrested until February 20th of 2023. And following his arrest, Mr. Daniele gave a recorded custodial interview.

Counts 1 and 2 of the Indictment charge Mr. Daniele with obstructing officers during a civil disorder, in violation of 18 U.S.C. 23 -- 231(a)(3).

Count 1 charges that the obstructive act occurred

near the Peace Circle. A government-filed bill of particulars indicates that the conduct at issue was stepping on a bike rack as an officer attempted to bring it back upright.

Count 2 charges that the obstructive act occurred near the Lower West Terrace. The government-filed bill of particulars indicates that the conduct at issue was pulling back a bike rack, which ended up on the ground.

In order to find the defendant guilty of these offenses, I must find that the government proved each of the following elements beyond a reasonable doubt:

First, the defendant knowingly committed or attempted to commit an act with the intended purpose of obstructing, impeding, or interfering with law enforcement officers;

Second, at the time of the defendant's actual or attempted act, the law enforcement officers were engaged in the lawful performance of their official duties incident to and during a civil disorder;

And, three, that the civil disorder in any way or degree obstructed, delayed, or adversely affected commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.

There's no dispute here as to elements 1 and 2.

At the time in question, law enforcement officers were engaged in unlawful performance of their official duties incident to and during a civil disorder, and the civil disorder obstructed, delayed, or adversely affected commerce or the movement of any article or commodity in commerce -- and that's evidenced by the Safeway Store information -- or affected the conduct or performance of any federally protected function, and it did, and that would be the duties of the Secret Service.

At issue is whether Mr. Daniele knowingly stepped on the first bike rack and knowingly pulled back on the second bike rack as opposed to with ignorance, mistake, or accident, and whether he had the requisite intent when he performed those acts.

As to Count 1, I cannot find beyond a reasonable doubt that Mr. Daniele acted with the intended purpose of obstructing, impeding, or interfering with law enforcement officers when he placed his foot on the bike rack. The evidence showed that Mr. Daniele had his foot on the bike rack only momentarily. The officer was able to continue raising the bike racks, suggesting that Mr. Daniele was not stepping on the bike rack with much force.

Mr. Daniele then stepped away from the line and moved forward only after the officers dropped the bike rack barriers to fall back to the Lower West Terrace. During

this time, there was no evidence that Mr. Daniele said anything to an officer or any -- to any officer, participated in any chanting, or took any other action suggesting that his intent at the time was to interfere with the officer's performance of his duties.

As to Count 2, I likewise find that I cannot find by a reasonable doubt -- I do not find beyond a reasonable doubt that Mr. Daniele acted with the intended purpose of obstructing, impeding, or interfering with law enforcement officers when he took hold of the bike rack and pushed it out of the way and to the ground.

The evidence is undisputed that another person lifted a different segment of the bike rack barrier and pulled back on it just as Mr. Daniele was reaching out his hand to offer an officer the baseball cap that he had picked up. The bike rack barrier moved toward Mr. Daniele. It would have been perfectly natural for him to grab the bike rack and move it out of the way to protect himself.

The bike rack posed some danger, as evidenced by the person behind Mr. Daniele jumping onto the ledge to avoid being hit. Also, Mr. Daniele does not do anything immediately after to impede any officer. He stands in the same location for some period of time.

The government has argued as to both Counts 1 and 2 that Mr. Daniele's intent can be inferred not only

from the acts captured on video but also the inconsistencies between his post-arrest statements to the FBI and the video evidence.

To be sure, Mr. Daniele said things to the FBI that were not accurate, just as he had not -- such as that he had not touched a barricade or been near the front of any police lines. Those statements were just wrong. That can be attributed, however, to the passage of time -- and it had been about two years -- and perhaps Mr. Daniele having convinced himself of the innocence of his actions as opposed to knowingly making false statements.

Count 3 of the Indictment charges Mr. Daniele with entering or remaining in a restricted building or grounds, in violation of 18 United States Code 1752(a)(1).

In order to find the defendant guilty of this offense, I must find that the government proved each of the following two offenses beyond a reasonable doubt.

First, the defendant entered or remained in a restricted building or grounds without lawful authority to do so; and, second, that the defendant did so knowingly.

There's no dispute here that Mr. Daniele entered or remained in a restricted building or grounds without lawful authority to do so.

As Inspector Hawa and Captain Ortega testified, there was a restricted perimeter set up for January the 6th,

and Mr. Daniele was not supposed to be inside of it.

Mr. Daniele also knew that he was without lawful authority to be within that restricted perimeter. He admitted as much on the witness stand, stating that he understood that he was not permitted to be on Capitol Grounds beyond the bike racks.

Even without this testimony, there was ample basis to find that he had the requisite knowledge. There were not only visible signs and bike racks, but everything Mr. Daniele witnessed that day should have been a clear indication that he was not permitted on Capitol Grounds: The police lines, the use of less-than-lethal crowd dispersal measures, the LRAD, and much, much more.

Mr. Daniele's defense turns on the legal question of whether he had -- whether he had to possess knowledge why the grounds were restricted that day; namely, that he, in fact, knew that Vice President Pence or his family were or would be at the Capitol that day.

As defense counsel has noted, there is a split among the judges in this district about whether the government must prove knowledge of the Vice President's presence, and that matter is presently pending before the D.C. Circuit.

I'm of the view that the government is not required to prove such knowledge beyond a reasonable doubt.

I agree with my colleagues who have concluded that the Vice President's presence is a jurisdictional fact, not an element of the offense for which knowledge must be proven. I agree with the reasoning of Judge Howell in her written decision in *United States versus Carnell*, 23-cr-139, and Judge Moss in his oral ruling in *United States versus Smith*, 23-cr-71. I respectfully disagree with my colleagues who have come to the opposite conclusion.

Let me add that, to the extent that defense counsel has suggested I should acquit Mr. Daniele because the issue -- that is, the legal issue -- is unresolved and was not resolved prior to January 6 and remains unresolved today, that is not a proper grounds for an acquittal, because doing so -- a proper grounds for acquittal, because proof of the actual elements of the crime have been satisfied beyond a reasonable doubt.

Count 4 of the Indictment charges Mr. Daniele with disorderly or disruptive conduct in a restricted building or grounds, in violation of 18 United States Code 1752(a)(2).

To find Mr. Daniele guilty of this offense, I must find the government proved each of the following three elements beyond a reasonable doubt:

First, that he engaged in disorderly or disruptive conduct in or in proximity to any restricted building or grounds;

Second, that he did so knowingly and with the intent to impede or disrupt the orderly conduct of government business or official functions;

Third, that his conduct occurred when or so that his conduct, in fact, impeded or disrupted the orderly conduct of government business or official functions.

Mr. Daniele's presence on the grounds and inside the building and presence on the grounds for up to two hours was disorderly and disruptive.

Let me read from the D.C. Circuit's holding in *United States versus Alford*, 89 F.4th 943, 946 from 2024. There, the Court wrote the following:

The trial evidence indicated that during Alford's brief time within the Capitol, he was neither violent nor destructive. Nevertheless, we affirm his convictions because a jury could rationally find that his unauthorized presence in the Capitol as part of an unruly mob contributed to the disruption of the Congress's electoral certification and jeopardized public safety.

A rational jury could conclude that Alford's actions were disruptive because his presence in the Capitol contributed to the Congress's multi-hour delay in completing the electoral certification.

There was ample evidence for the jury to conclude that Alford knowingly entered the Capitol without

authorization. He walked past numerous "Area Closed" signs, stood by as rioters in the building, through open the nonpublic -- excuse me, entered the nonpublic Upper House door, walked into the Capitol despite a shrill security alarm, and then passed through a metal detector without undergoing any security screening.

A police officer testified at trial that each unauthorized individual posed a security hazard and that Congress would not resume its business until the entire building was cleared and checked for threats like lurkers or explosives.

Alford's entry into the Capitol, alongside dozens of others, directly contributed to the Congress's need to recess to ensure the safety of its members. Indeed, entering the Capitol as part of a crowd, rather than as a loan individual, magnified the disruptiveness of his presence. Each additional person, no matter how modestly behaved, increased the chaos within the building, the police's difficulty in restoring order, and the likelihood of interference with Congress's work.

That was the evidence in Mr. Alford's case and is certainly comparable to that here. And the evidence here involved more than mere presence. For 90 minutes, Mr. Daniele was on the west side of the Capitol before he entered the Capitol Building. During that time, the video

evidence showed him yelling on some occasions, pointing at police officers as if to taunt them, and flipping the bird to the establishment. I'll say that was not the most logistical explanation for why you were flipping the bird, Mr. Daniele.

Second, I find beyond a reasonable doubt that he did so knowingly -- that is, he acted knowingly -- and with the intent to impede or disrupt the orderly conduct of government business or official functions. He joined a mob that caused Congress to recess and could not resume until later that evening.

You may or may not have known that Mike Pence, Vice President, was in the building, but you surely knew that the business of the United States people is conducted in the halls of Congress and, in fact, was being conducted that very day. Why else come to Washington, D.C., on January 6th?

Importantly, why would there be any other reason to march to the Capitol Building? And why else would thousands of people have surrounded the Capitol and hundreds of police officers tried to protect it? And why else would you have been there unless Congress was doing the people's work?

You were present for a good part of the President's speech. You may not have heard all of it, but

I'm confident that you heard enough to understand that part of the speech was intended to influence the joint session that was about to convene that afternoon.

Your actions at the Capitol also suggested an understanding that congressional business was going on inside.

You're can be seen yelling at various points. You tried to get up the stairs underneath the scaffolding even before you were sprayed. And, of course, you extended both of your middle fingers in the direction of the building while you stood just feet away from a line of officers who were protecting it. Again, it defies logic that your presence there that day was not to impede or disrupt the workings of Congress.

Third, I do find beyond a reasonable doubt that your conduct occurred when or so that it, in fact, did impede or disrupt the orderly conduct of government business or official functions. The congressional proceedings adjourned, the Vice President had to be taken out by the Secret Service, and the police functions were disrupted as well.

And I will just note once more that the government, for this count, was not required to prove that you were aware that the Vice President would be at the Capitol that day in order to establish the restricted

building or grounds element.

Count 5 charges Mr. Daniele with disorderly conduct in a Capitol Building or Grounds, in violation of the 40 United States Code 5104(e)(2)(D).

The elements of this offense which the government must prove beyond a reasonable doubt are:

First, that the defendant engaged in disorderly or disruptive conduct in any of the United States Capitol Buildings or Grounds;

Second, that the defendant did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress;

And, third, that the defendant acted willfully and knowingly.

First, I've already found that you have engaged in disorderly or did engage in disorderly or disruptive conduct on the grounds and in the building itself.

Second, I've also found that you did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress.

And, third, I do find that you acted willfully and knowingly.

Broadly speaking, a person acts willfully when they act with the knowledge that their conduct was unlawful.

This is *Bryan versus United States*, 424 U.S. 184

at 199 to 192.

You very well knew that you were not supposed to be there that day. You admitted as much during your testimony.

Count 6 of the Indictment charges Mr. Daniele with parading, demonstrating, or picketing in a Capitol Building, in violation of 40 United States Code 5104(e)(2)(G).

The elements of this offense, which the government must prove beyond a reasonable doubt, are:

First, that the defendant paraded, demonstrated, or picketed in any of the United States Capitol buildings;

Second, that the defendant did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress;

And, third, that the defendant acted willfully and knowingly.

First, I do find that you did parade and demonstrate.

To "parade" means to take part in a march or procession organized on a grand scale in support of some political object. Certainly that is what you were doing when you entered with thousands of others with the intent to disrupt congressional proceedings.

To "demonstrate" means to take part in a public manifestation by a number of persons of interest in some

public question or sympathy with some political or other cause, usually taking the form of a procession en masse meeting.

Obviously, you were demonstrating that day. Certainly you joined a public display of group feelings toward a person or cause.

Second, I've already found that you did these acts with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress.

And, third, that you acted willfully and knowingly.

You've argued that you went inside the building, not to disrupt Congress, but to wash out your eyes. That explanation is hard to square with the video evidence.

For one, you were hit with pepper spray on the Lower West Terrace underneath the scaffolding. The evidence showed that you were able to rinse your eyes out some amount.

At that point, one would have thought you'd had enough. You could have simply left at that point, gone in the other direction. But at that point, instead, you went up the stairs and found your way to the Senate Wing doors, through which -- and entered them even though there was clear evidence of forced entry.

You admitted to seeing glass on the floor. You took a photo of a broken window. The video evidence does not show you to be in distress, certainly not so much distress that you did not have the wherewithal to be on your phone as you entered, take a photograph of a broken window, hand your phone to someone else and have them take a photo of you, and then continue on into the Crypt, where you then turned around and left shortly thereafter. Maybe it was at that point you realized you couldn't go any further, or maybe it was at that point you realized you had had enough.

This idea that you thought it was acceptable to enter the building because there were no police present in the hallway inside the Senate Wing door makes very little sense to me. For 90 minutes, you had witnessed police try to courageously protect the very building you say you thought it was acceptable to enter.

So the Court finds as follows:

Count 1, for obstructing officers during a civil disorder -- this is at the Peace Circle: Not guilty;

Count 2, for obstructing officers during a civil disorder at the Lower West Terrace: Not guilty;

Count 3, for entering and remaining in a restricted building or grounds: Guilty;

Count 4, for disorderly and disruptive conduct in a restricted building or grounds: Guilty;

Count 5, for disorderly conduct in a Capitol Building or Grounds: Guilty;

And, finally, Count 6, for parading, demonstrating, or picketing in a Capitol Building: Guilty.

All right. So that will be the verdict of the Court.

Mr. Kaplan?

MR. KAPLAN: Yes, Your Honor.

THE COURT: With respect to Counts 3 and 4 as to which we have a difference of opinion on the legal question, please just make sure you file your motion for new trial or judgment without -- notwithstanding the verdict, in a timely manner. My expectation is that by the time of sentencing, the D.C. Circuit will have ruled on this issue.

And let me just say for the record now that I'm not convinced by a reasonable doubt that Mr. Daniele knew, in fact, that the Vice President was there that day or was going to be there. And so if the D.C. Circuit comes down with an opinion that's different than mine, I will enter a judgment of acquittal on those counts prior to sentencing, because I do expect to have a decision before sentencing.

MR. KAPLAN: Your Honor, I appreciate that. Thank you.

THE COURT: Sure.

I just want to make sure it's done on time because it is --

MR. KAPLAN: Yes.

Do you know, can that be done before sentencing?

THE COURT: Can what be done before sentencing?

MR. KAPLAN: The motion?

THE COURT: Sure.

You could do it tomorrow. You could ask for a new trial tomorrow.

MR. KAPLAN: Okay.

THE COURT: All right. So that is the -- that's the judgment of the Court.

Let's set a sentencing date some 120-or-so days out.

MR. KAPLAN: Your Honor, may I just ask, just for edification only, because the Count 3, 4, 5, and 6, do I understand those are misdemeanor counts?

THE COURT: Correct.

MR. KAPLAN: Okay.

THE COURT: 3 and 4 are 1-year misdemeanors. Counts 5 and 6 are 6-month misdemeanors.

MR. KAPLAN: That's what I thought. Thank you, Your Honor.

Your Honor, if I could, I'd also -- I don't know if you remember, I know Ms. Jackson is kind of new here, but

one of the things, going back several month ago, I said the summertime -- because I have two still young children, I'm --

THE COURT: I'm looking at September.

MR. KAPLAN: Thank you, Your Honor. I appreciate that.

THE COURT: It's moving into August.

How about August the 2nd at -- August the 4th, pardon me, August the 4th at 1:30 in the afternoon?

MR. KAPLAN: I just have to power up my phone. Forgive me, Your Honor.

THE COURT: Sure.

MR. KAPLAN: That was August 4th?

Is that going to give Probation enough time to do the Presentence Report?

THE COURT: Yeah, plenty.

MS. JACKSON: Your Honor, I believe August the 4th is a Sunday.

THE COURT: Oh, I misspoke. I meant October the 4th. Sorry.

MR. KAPLAN: October?

THE COURT: Yes. Sorry. I now understand the reason for your question.

Yes. I meant to say October the 4th, not August 4th. October the 4th. Sorry about that. 1:30.

MR. KAPLAN: At 1:30, Your Honor?

THE COURT: Yes.

MR. KAPLAN: Thank you, Your Honor.

THE COURT: We will enter a Minute Order that reflects the deadlines for both sentencing memos and for the Presentence Investigation Report. Typically those are due a week or so before sentencing. So a week or so before sentencing.

MR. KAPLAN: I hope the government is having the same bail conditions, Your Honor, as far as release?

THE COURT: Yeah.

I mean, I don't know what the government is going to ask for, but my intention is certainly to allow Mr. Daniele to remain on release pending sentencing.

MS. JACKSON: Yes, Your Honor.

MR. KAPLAN: Thank you.

THE COURT: Okay.

Just so for your edification, Mr. Daniele, prior to sentencing, a few things will happen. You can stay seated, sir. That's fine. You can stay seated.

You'll be interviewed by the Probation Office. The Probation Office will prepare a Presentence Investigation Report for me. The purpose of that report is a number of things. But one of the things that will happen is that they will interview you so I can get some

information about your background and your history. You are entitled to have your lawyer with you during that interview. You also have the right to have that report -- to read that report and review it before sentencing.

And, finally, you'll have the opportunity, through your counsel, to present any information you would like for me to consider at sentencing.

And you also will have the opportunity to address me at sentencing as well, okay?

THE DEFENDANT: Thank you.

THE COURT: All right.

Is there anything else we need to take care of before we adjourn?

MS. JACKSON: None from the government, Your Honor.

MR. KAPLAN: Not from the defense, Your Honor.

THE COURT: Okay. Thank you, all, very much. I appreciate your presentations, take care, enjoy the rest of your summer, and we'll see you in a few months.

MR. KAPLAN: Thank you, Your Honor.

THE COURT: Thank you.

COURTROOM DEPUTY: All rise.

This court is now adjourned.

(Proceedings concluded at 5:02 p.m.)

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

Date:__July 26, 2024_______ ______________________________

William P. Zaremba, RMR, CRR

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | |
| | . | |
| Plaintiff, | . | CR No. 22-0099 (RJL) |
| | . | |
| v. | . | |
| | . | Washington, D.C. |
| JAKE MAXWELL, | . | Tuesday, November 14, 2023 |
| | . | 3:53 p.m. |
| Defendant. | . | |
| . . . . . . . . . . . . . . . . . | . | Pages 392 through 410 |

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: ELIZABETH N. ERIKSEN, ESQ.
U.S. Department of Justice
1301 New York Avenue
8th Floor
Washington, DC 20005

NATHANIEL K. WHITESEL, AUSA
SEAN BRENNAN, AUSA
U.S. Attorney's Office
601 D Street NW
Washington, DC 20530

For Defendant: MICHAEL T. VAN DER VEEN, ESQ.
Van Der Veen, Hartshorn & Levin
1219 Spruce Street
Philadelphia, PA 19107

WILLIAM J. BRENNAN, ESQ.
1600 Locust Street
Philadelphia, PA 19103

Court Reporter: BRYAN A. WAYNE, RPR, CRR
U.S. Courthouse, Room 4704-A
333 Constitution Avenue NW
Washington, DC 20001

P R O C E E D I N G S

THE DEPUTY CLERK: Your Honor, we're in criminal action 22-099, United States of America versus Jake Maxwell. If I can have counsel to approach the podium, state your name for the record, starting with the United States.

MS. ERIKSEN: Good afternoon, Your Honor. Elizabeth Eriksen, Nathaniel Whitesel, and Sean Brennan for the United States, joined by Special Agent Joshua Floyd and our paralegal Taylor Wilbert.

THE COURT: Good afternoon.

MR. VAN DER VEEN: Good afternoon, Judge. Michael van der Veen on behalf of the Mr. Maxwell, who is present here today, along with William Brennan, Adam Leasure, and Abigail Cohen.

THE COURT: Good afternoon. All right, everyone. We're here for the Court's verdict in the case, which I've prepared in writing.

Defendant Jake Maxwell is charged with committing seven offenses relating to his conduct on the U.S. Capitol on January 6, 2021. After a bench trial on those seven offenses, the Court reaches the following verdict, relying only on evidence and testimony admitted at trial.

Count One. Count One of the indictment charges Mr. Maxwell with civil disorder, in violation of 18 U.S. Code § 231(a)(3). For him to be guilty of that offense, the government must

prove, beyond a reasonable doubt,

(1) that the defendant knowingly committed or attempted to commit an act for the intended purpose of obstructing, impeding, or interfering with one or more law enforcement officers;

(2) that at the time of the defendant's actual or attempted act, the law enforcement officer or officers were engaged in the lawful performance of their official duties incident to and during a civil disorder; and

(3) that the civil disorder in any way or degree obstructed, delayed, or adversely affected either commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function;

As for the first element, the Court finds, beyond a reasonable doubt, that Mr. Maxwell knowingly committed an act intending to obstruct, impede, or interfere with law enforcement officers.

The evidence is clear regarding Mr. Maxwell's movements on the U.S. Capitol grounds that day: He entered the south end of the West Plaza between 2:00 and 2:30 p.m. and watched as rioters shoved, threw objects at, and attacked officers from the Metropolitan Police Department and the U.S. Capitol Police, who were attempting to hold the line on the west front.

Shortly after 2:30 p.m., Mr. Maxwell made his way to the front of the crowd and came face-to-face within a line

of officers, who — as Mr. Maxwell himself acknowledged — "were defending the Capitol." With the mob then pressing behind him, Mr. Maxwell surged forward into the police line and, in fact, breached it, eventually coming to rest behind that line.

Over the next two-and-a-half hours, Mr. Maxwell moved from his position behind the police line, which collapsed shortly after he left the West Plaza, traveled up to the Lower West Terrace, then the tunnel, and finally the Upper West Terrace; for much of that time, Mr. Maxwell was part of a crowd that included violent rioters, whose assaultive conduct Mr. Maxwell could not fail to see.

The Court therefore finds that the defendant's acts and movements that day were not made "through ignorance, mistake, or accident," but rather with a full awareness that they would obstruct, impede, or interfere in the police's ability to defend the Capitol.

The Court additionally finds that Mr. Maxwell, who deliberately cut a path to the front of the mob and the police line, and who joined in a crowd that he knew included assaultive rioters, did so with the "intended purpose" of obstructing, impeding, or interfering with the police's mandate to protect the Capitol and its inhabitants and to clear the grounds of all demonstrators. As such, the Court finds the first element of civil disorder is satisfied in Mr. Maxwell's case.

As to the second element, the Court finds, beyond a reasonable doubt, that at the time of Mr. Maxwell's acts, Metropolitan Police Department and the Capitol Police were engaged in the lawful performance of their official duties incident to and during a civil disorder. They were protecting the U.S. Capitol and the elected officials and staff therein from an obvious public disturbance brought on by thousands of demonstrators, many of whom turned violent and caused damage to the Capitol and injury to many individuals.

Finally, as to the third element, the Court finds, beyond a reasonable doubt, that the civil disturbance adversely affected commerce in that it forced a nearby business to close early and lose out on profits that it would have otherwise realized.

Accordingly, the Court finds Mr. Maxwell guilty of Count One, civil disorder.

Count Two charges Mr. Maxwell with assaulting, resisting, or impeding an officer from the U.S. Capitol Police in, violation of 18 U.S. Code § 111(a)(1). For Mr. Maxwell to be guilty of the felony version of that offense, the government must prove, beyond a reasonable doubt,

(1) that the defendant assaulted, resisted, opposed impeded, intimidated, or interfered with an officer from the United States Capitol Police Department;

(2) that the defendant did such acts forcibly;

(3) that the defendant did such acts voluntarily and intentionally;

(4) that the person assaulted, resisted, opposed, impeded intimidated, or interfered with was an officer or an employee of the United States who was then engaged in the performance of his or her official duties; and

(5) that the defendant made physical contact with the officer or acted with the intent to commit another felony.

As to the first and the fifth elements, the Court finds, beyond a reasonable doubt, that Mr. Maxwell's contact with the shield of the U.S. Capitol Police officer on the police line on the West Plaza amounted to opposing, impeding, or interfering with that officer, and involved physical contact with him.

As to the fourth element, the Court also finds, beyond a reasonable doubt, that the U.S. Capitol Police officer was a federal officer engaged in the performance of his official duties, that is, protecting the U.S. Capitol and the elected officials and staff therein.

However, the Court has a reasonable doubt as to the second and third elements of this charge, which require a finding that Mr. Maxwell's contact with the officer's shield was forcible, voluntary, and intentional.

The evidence and testimony admitted during trial revealed that Mr. Maxwell, during the interaction in question, was at

the front of a large, surging crowd while his father maintained a, what he described as a "death grip" around his waist to direct and manipulate his son's movements.

In still photos and videos alike, Mr. Maxwell is shown hemmed in, even squashed, between the crowd and his father on one hand and the line of officers on the other. Officer Harvell himself, whose body-worn camera captured the incident, agreed on cross-examination that it was "possible" that Mr. Maxwell was "being pushed" from behind.

From the collective evidence, the Court, too, finds it "possible" — if not likely — that Mr. Maxwell's contact with the U.S. Capitol Police officer's shield was more the result of the propelling, pushing crowd and his father's reactive maneuvering than it was his own action.

At any rate, even if Mr. Maxwell's contact with the shield was done voluntarily or with the active use of force, the evidence leaves sufficient room to doubt that he committed the act with the requisite intent.

Indeed, the government offers little evidence on this point besides video footage of the incident itself; and in this particular case, the video footage — which is fast-moving, sometimes blurry, and often indeterminate — is not enough, standing alone, to convince the Court that Mr. Maxwell had the intent to oppose, impede, or interfere with the particular officer holding that shield.

Accordingly, the Court finds Mr. Maxwell not guilty of Count Two, assaulting, resisting, or impeding a U.S. Capitol Police officer.

Count Three. Count Three charges Mr. Maxwell with assaulting, resisting, or impeding Officer Laschon Harvell from the Metropolitan Police Department, in violation of 18 U.S. Code 111(a)(1). For Mr. Maxwell to be guilty of the felony version of that offense, the government must prove, beyond a reasonable doubt,

(1) that the defendant assaulted, resisted, opposed, impeded, intimidated, or interfered with Officer Harvell, an officer of the Metropolitan Police Department;

(2) that the defendant did such acts forcibly;

(3) that the defendant did such acts voluntarily and intentionally;

(4) that the person assaulted, resisted, opposed, impeded, intimidated, or interfered with was assisting officers of the United States who were then engaged in the performance of their official duties; and

(5) that the defendant made physical contact with that officer or acted with the intent to commit another felony.

As to the first and fifth elements, the Court finds, beyond a reasonable doubt, that Mr. Maxwell's two contacts with Officer Harvell's baton amounted to opposing, impeding, or interfering with Officer Harvell and involved physical contact

with him. As to the fourth element, the Court also finds beyond a reasonable doubt that, during the incidents in question, Officer Harvell was assisting the U.S. Capitol Police, who were then engaged in the performance of their official duties of protecting the U.S. Capitol and the elected officials and staff therein.

The Court does not believe, however, that the government has met its burden on the second element of the offense, requiring that Mr. Maxwell's contact with the baton be "forcible." Even assuming otherwise, however, the Court again has a reasonable doubt as to the charge's third element, that the acts were done voluntarily and intentionally.

The two "baton incidents" that form the basis of Mr. Maxwell's second charged offense under 111(a)(1) are, first, an incident in which Officer Harvell's baton is clamped between Mr. Maxwell's inner bicep and upper torso; and second, an incident in which Mr. Maxwell clasps his hand around Officer Harvell's baton and holds it one or two seconds.

As to the first incident, the evidence and testimony do not lead this court to inescapably conclude that Mr. Maxwell held Officer Harvell's baton under his arm with any intent to disarm Officer Harvell, to wrest the baton away, or to otherwise resist, oppose, impede, intimidate, or interfere with Officer Harvell.

To the contrary, at least one reasonable view of the video

and photo evidence is that Mr. Maxwell's action, or reaction, in clamping down on the baton was reflexive in nature, or even defensive — a direct response to the baton thrusting into his torso, which occurred, no less, only seconds after Mr. Maxwell was hit on the head with that same baton.

To be sure, Officer Harvell testified that he believed Mr. Maxwell's aim was to disarm him. However, Officer Harvell's belief, which was based on his review of the evidence in this case rather than his own memory, is not more persuasive than the footage of the incident itself, which shows that Mr. Maxwell released the baton from under his arm in less than one second after he clamped down on it, a view that suggests that Mr. Maxwell never intended to, and indeed did not, loosen Officer Harvell's grip on the baton, much less take it away.

As for the second baton incident, the Court finds that the video footage and still photos displaying this incident are inconclusive at best. Although, no doubt, Mr. Maxwell's left hand is shown closing around Officer Harvell's baton, that action alone does not carry the weight the government ascribes to it.

It says little about whether Mr. Maxwell intended, as the government argues, to wrest the baton away from Officer Harvell, or instead whether he was simply trying to block the baton as it was being thrust toward him, in the same kind of

reflexive motion that might describe his first baton incident.

At the end of the day, of course, the government is entitled to its view of the evidence. But it is a close call, and, under our system of government, close calls go to the criminal defendant.

Accordingly, the Court finds Mr. Maxwell not guilty of Count Three, assaulting, resisting, or impeding Officer Harvell of the Metropolitan Police Department.

Count Four. Count Four charges Mr. Maxwell with entering and remaining in a restricted building or grounds, in violation of 18 U.S. Code § 1752(a)(1). For him to be guilty of that offense, the government must prove, beyond a reasonable doubt,

(1) that the defendant entered or remained in a restricted building or grounds without lawful authority to do so; and

(2) that the defendant did so knowingly.

As to the first element, the Court finds, beyond a reasonable doubt, that by entering and remaining on the West Plaza, Lower West Terrace, and Upper West Terrace, Mr. Maxwell was well within restricted grounds and had no authority to be there. As to the second element, the Court also finds, beyond a reasonable doubt, that Mr. Maxwell knew he was not supposed to be in those places.

Regardless of whether he heard or heeded police warnings to turn back, or saw the multiple lines of barriers that once encircled the U.S. Capitol grounds, there can be no question,

at a minimum, that the police line that Mr. Maxwell found himself in front of alerted him to the fact that he was not permitted on the grounds.

And, if the police line by itself were not sufficient to give Mr. Maxwell notice of his trespassing, the conduct of the other, more violent rioters was surely strong evidence that Mr. Maxwell, who observed this conduct, was not where he was supposed to be anyway.

Accordingly, the Court finds Mr. Maxwell guilty of Count Four, entering and remaining in a restricted building or grounds.

Count Five. Count Five charges Mr. Maxwell with disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S. Code § 1752(a)(2). For him to be guilty of that offense, the government must prove, beyond a reasonable doubt,

(1) that the defendant engaged in a disorderly or disruptive conduct in, or in proximity to, any restricted building or grounds;

(2) that the defendant did so knowingly, and with the intent to impede or disrupt the orderly conduct of government business or official functions; and

(3) that the defendant's conduct occurred when, or so that, his conduct in fact impeded or disrupted the orderly conduct of government business or official functions.

As to the first and second elements, the Court finds, beyond a reasonable doubt, that Mr. Maxwell engaged in disorderly and disruptive conduct, with the knowledge and intent that this conduct would impede law enforcement duties, for the same reasons the Court has already articulated in finding him guilty of civil disorder.

The Court additionally finds that Mr. Maxwell — who acknowledged, in his testimony, that he was aware of what was going on inside the Capitol that day and was there to "protest" it — also intended to disrupt congressional business.

As to the third element, the Court finds, beyond a reasonable doubt, that Mr. Maxwell was among the thousands of demonstrators whose presence and conduct in and around the U.S. Capitol did, in fact, impede and disrupt not only the police trying to do their job, but also the official functions of Congress: They delayed Congress's certification of the Electoral College vote.

Accordingly, the Court finds Mr. Maxwell guilty of Count Five, disorderly and disruptive conduct in a restricted building or grounds.

Count Six. Count Six charges Mr. Maxwell with engaging in physical violence in a restricted building or grounds, in violation of 18 U.S. Code § 1752(a)(4). For him to be guilty of that offense, the government must prove, beyond a reasonable doubt,

(1) that the defendant engaged in an act of physical violence against a person or property in, or in proximity to, a restricted building or grounds; and

(2) that the defendant did so knowingly.

As to the first element, the Court cannot find, beyond a reasonable doubt, that Mr. Maxwell engaged in an act of physical violence against the U.S. Capitol Police officer who is the subject of Count Two, or against Officer Harvell, who is the subject of Count Three. These are the only alleged "acts of physical violence" undergirding this charge.

And the parties have agreed in their joint pretrial submission that an act of physical violence is essentially an act involving property damage, which is not at issue here, or an assault or other infliction of bodily harm against another person. Because the Court did not find, beyond a reasonable doubt, that Counts Two or Three involved any assault or infliction of bodily harm, the Court cannot find that Mr. Maxwell committed that requisite act of physical violence.

Accordingly, for the reasons articulated by the Court in finding Mr. Maxwell not guilty of Counts Two and Three, the Court likewise finds Mr. Maxwell not guilty of Count Six, engaging in physical violence in a restricted building or grounds.

Count Seven. Finally, Count Seven charges Mr. Maxwell

with an act of physical violence in the Capitol building or grounds, in violation of 40 U.S. Code § 5104(e)(2)(F). For him to be guilty of that offense, the government must prove, beyond a reasonable doubt,

(1) that the defendant engaged in an act of physical violence within the Capitol building or grounds; and

(2) that the defendant acted willfully and knowingly.

As with Count Six, the Court cannot conclude that Mr. Maxwell engaged in an act of physical violence based on his alleged acts against the U.S. Capitol Police officer and Officer Harvell, which are the only acts on which Counts Six and Seven, as well as Counts Two and Three, are based.

Accordingly, the Court finds Mr. Maxwell not guilty of Count Seven, an act of physical violence at the Capitol building or grounds.

This is the verdict of the Court.

Is there any reason not to set a sentencing date?

MS. ERIKSEN: No, Your Honor. We can do that.

MR. BRENNAN: No, Your Honor.

MR. VAN DER VEEN: That's fine with the defense, Judge.

THE COURT: Say around 90 days, roughly, about mid to late February. Check your calendar, Counsel, for February 22, please.

MR. VAN DER VEEN: Fine with the defense, Judge.

MS. ERIKSEN: It's fine for the government, Your Honor.

THE COURT: Four o'clock.

MR. VAN DER VEEN: Judge, if we could just check Mr. Brennan's calendar as well? I may have spoken too quickly.

MR. BRENNAN: Sorry, Judge. My phone was totally off. It's firing up now.

THE COURT: You've got one of those ethics hearings up in Pennsylvania you gotta go to?

MR. BRENNAN: You never know.

THE COURT: All right.

MR. BRENNAN: Looks good to me, Your Honor.

THE COURT: Very well. Sentencing memos a week in advance. That's the 15th of February, okay? If you don't get the memo in on time, I may have to move the date. So get the sentencing memo in a week in advance. That's important.

And remember what I told you before — both sides, that is, of course — in this courtroom a person can exercise his or her constitutional right to a trial by jury or a trial by court and not, as a result, waive his chance to get acceptance of responsibility.

So, at the time of sentencing in this case, there's the possibility at least -- and that's up to the parties to decide how they want to deal with it -- to still get acceptance of responsibility. I can't give a third point under any scenario. Only the government has the province to do that.

But the Court can give two points.

But the burden to convince the Court is on the defense, not on the government. The defense has to demonstrate, from the record and from whatever else it has as its basis, that the defendant in fact does accept responsibility. That's the burden on the defense, not on the government. The government can seek to refute it if it wishes, but that's the defense's burden. Okay?

Any questions for the government?

MS. ERIKSEN: No, Your Honor.

THE COURT: Any questions for the defense?

MR. VAN DER VEEN: Only that my client, with the Court's permission, remain out on bail posted.

THE COURT: Yes. I assume the same conditions will be acceptable to the government. He doesn't have any violations.

MS. ERIKSEN: Yes, Your Honor.

THE COURT: He will remain under the same conditions as before. No changes.

Mr. Maxwell, stand up a second.

(Defendant complies.)

I'm stating the obvious. You've probably been told what I'm about to say by both your lawyers: You're in a different status now than you were when you entered the courtroom today. You now have three convictions for which you'll be sentenced. It's imperative that you comply a hundred percent with these

conditions. Otherwise, you'll put yourself in jeopardy of a worse sentence than you might otherwise be able to get.

So, if you have any question about what you can or can't do, what you should or shouldn't do, pick up the phone, call your -- you've got two very experienced counsel here. Call one of them and get their advice. Don't put yourself in a position where you're saying, well, I couldn't get a hold of Mr. van der Veen or I couldn't get a hold of my other counsel --

THE DEFENDANT: Yes, sir.

THE COURT: -- Mr. Brennan. So don't snatch defeat from the jaws of victory, okay?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Any other issues?

MS. ERIKSEN: No, Your Honor.

THE COURT: All right. We'll stand in recess.

(Proceedings adjourned at 4:18 p.m.)

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne